347 P.2d 312

**STATE of New Mexico, Plaintiff-Appellee,**

v.

**Jose Franco PADILLA, alias Joe Franco, Defendant-Appellant.**

No. 6506.

Supreme Court of New Mexico.

Dec. 8, 1959.

W. E. Bondurant, Jr., John P. Cusack, Jr., Roswell, for appellant.

Hilton A. Dickson, Jr., Atty. Gen., Thomas O. Olson, B. J. Baggett, Asst. Attys. Gen., for appellee.

CARMODY, Justice.

The defendant was found guilty of first degree murder, of having carnal knowledge of a child under the age of ten years, and of kidnapping. The jury not having specified life imprisonment, he was sentenced to death by execution, and it is from this judgment that he appeals.

The circumstances of the offense are not actually material as to this appeal and will be mentioned only briefly for the purpose of clarity.

The defendant is a Spanish-American who speaks and understands English fairly well but normally converses in Spanish. He was twenty-five years of age on October 6, 1957, the date of the alleged commission of the crimes charged. His education was limited to the second grade and he had worked as an itinerant farm laborer all of his life. His intelligence rating was that of a dull normal individual.

On October 5, 1957, the defendant drank beer from shortly after noon until about midnight at a bar in Roswell, New Mexico, and during this period of time bought three marijuana cigarettes and smoked at least two of them. When leaving the bar, he bought a half case of beer and then proceeded to the home of the deceased (a five-year-old child) near Roswell and took her into his car. He then drove approximately fourteen miles southeast of Roswell, at which place he raped the child and thereafter killed her by stabbing her with a screwdriver. The defendant then took a seat cover from the car, placed it over the body of the little girl and covered it with sand. Thereafter, he went to his place of residence, packed a bag, loaded a rifle, and proceeded to El Paso, Texas, in his car. At El Paso, he parked his car in a parking lot and then fled into the interior of Old Mexico where he was arrested and brought back to the American authorities on October 12, 1957. He was returned to Roswell the same day by the officers and a confession was obtained immediately thereafter.

At the trial, the defendant did not take the stand, and the actual details of the crimes are contained only in the confession and in statements made by the defendant to the expert witnesses who were examining him as to his sanity. There was certain lay testimony as to his sanity, in which was detailed past sickness of the defendant and his conduct as to fits of anger, talking to himself and having laughing spells. Two medical doctor psychiatrists were appointed by the court and testified as experts, one on behalf of the state and one on behalf of the defendant. He was also examined by another psychiatrist who is not licensed in the State of New Mexico and by a psychologist employed by the New Mexico State Hospital. There was a conflict in the testimony at the trial as to the defendant's sanity, one medical psychiatrist testifying that he was insane, the other testifying that he was sane; and there was also testimony

292

by the non-licensed psychiatrist that he was not insane, and, in addition, testimony by the psychologist that the defendant was not insane.

The defendant relies on six points for reversal, all relating to his mental condition. These will be discussed under three separate categories.

## I.

■■■ The defendant maintains that the court should have instructed the jury that they might consider mental defects and mental condition in ascertaining whether or not the defendant had the power to deliberate the acts charged, so as to reduce the charge from first degree murder to second degree murder.

The doctrine contended for by the defendant is sometimes referred to as that of "diminished" or "partial responsibility." This is actually a misnomer, and the theory may not be given an exact name. However, it means the allowing of proof of mental derangement short of insanity as evidence of lack of deliberate or premeditated design. In other words, it contemplates full responsibility, not partial, but only for the crime actually committed. This theory has been discussed at great length in many cases from varying jurisdictions and is the subject of several annotations, treatises and law review articles almost without number. ·

This court has never been called upon to rule upon the specific point involved, although on occasion there is language to be found in several of our opinions which might tend to influence us one way or the other. Territory v. Kennedy, 1910, 15 N.M. 556, 110 P. 854; State v. Nevares, 1932, 36 N.M. 41, 7 P.2d 933; State v. Roy, 1936, 40 N.M. 397, 60 P.2d 646, 110 A.L.R. 1; State v. Moore, 1938, 42 N.M. 135, 76 P.2d 19; State v. Folk, 1952, 56 N.M. 583, 247 P.2d 165; State v. White, 1954, 58 N.M. 324, 270 P.2d 727.

The serious student of the subject will have no trouble finding a great wealth of material, not only in case law but in texts, articles and annotations. Of particular assistance, see Report of Royal Com. on Capital Punishment 130 (1949–53); Annotation, 45 A.L.R.2d 1447; Weihofen, Mental Disorder as a Criminal Defense, 174–195.

Throughout the United States, the problem has arisen in a great many jurisdictions, and it appears that at least eleven jurisdictions approve of the doctrine contended for by the defendant. These are California, Colorado, Connecticut, Indiana, Nebraska, Ohio, Rhode Island, Tennessee, Utah, Virginia and Wisconsin. Whereas at least four jurisdictions have apparently rejected the theory. These states are Arizona, Idaho, Missouri and Nevada. Several other jurisdictions, without enumerating them, have not squarely passed upon

the question, although five apparently approve of the doctrine and three possibly reject it. Compare Weihofen, Mental Disorder as a Criminal Defense, 184–185. The Supreme Court of the United States in Fisher v. United States, 1946, 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382, 166 A. L.R. 1176, by a divided court, refused to express an opinion with respect to the theory contended for by the defendant here. However, in very strong dissents by Justices Frankfurter, Murphy and Rutledge, it was urged that the rule should be adopted and the logic of this reasoning has received widespread approval by many authorities.

The course of the law on insanity in England and the United States was generally set in the M'Naghten Case, 10 Clark & F. 200, 8 Eng. Reprint 718, which enunciated what is loosely called "the right and wrong test." Although mentioned in our prior cases, this rule was specifically approved by us in State v. Roy, supra, and State v. Moore, supra. Subsequently, in State v. White, supra, the M'Naghten rule was extended by adding to the "right and wrong" test the additional qualification of being incapable of preventing oneself from committing the act as a result of disease of the mind.

This was the status of our decisions at the time of the trial of the instant case, and the trial judge properly instructed the jury as to the issues of insanity and the defendant makes no objection thereto. However, his instruction No. 3, which was tendered but refused by the trial court, reads as follows:

"If you find the defendant was legally sane, then the Court instructs you that as an additional defense if you find or if you have a reasonable doubt whether by reason of a disease or defect of the mind the defendant was incapable of thinking over the fatal act beforehand with a calm and reflective mind (or with a fixed and settled deliberation and coolness of mind) then, you shall find the defendant not guilty of first degree murder and will pass on to the question of whether he is guilty of second degree murder."

The trial court also instructed the jury as to the elements of deliberation and premeditation and, in addition, gave instruction No. 23 which related to the drinking of intoxicating liquor and smoking of marijuana. This instruction advised the jury "that if by reason of either intoxication or the use of marijuana or both, the mind of the defendant was incapable of that cool and deliberate premeditation necessary to constitute murder in the first degree, but that the killing was unlawful, necessarily it would be murder in the second degree, as malice would be implied." This particular instruction, or one like it, has been given ever since our decision in State v. Brigance, 1926, 31 N.M. 436, 246 P. 897, and there is no question but that such an

instruction was proper in the instant case. However, the question immediately arises as to why there should be a different rule and perhaps a more lenient one with respect to a user of alcohol or drugs than in the case of one who may be afflicted with a mental disease not of his own making. If alcohol or drugs can legally prevent a person from truly deliberating, then certainly a disease of the mind, which has the same effect, should be given like consideration. Compare Hopt v. People, 1881, 104 U.S. 631, 26 L.Ed. 873.

The above is actually the basic theory upon which most of the cases which approve the doctrine are based. On the contrary, those jurisdictions which refuse approval of the theory apparently take the stand that the "right or wrong" test is all inclusive and that either a person is sane and therefore fully responsible for the consequences of his acts, including the capability to deliberate and premeditate, or is insane and not responsible. These cases take the position that there is no middle ground, or, as is expressed in some opinions and by some authorities, that the rule should be either black or white and that there may be no shades of gray in between.

It would unduly lengthen this opinion to cite or quote at length from the many cases and articles on the subject. However, among others which are directly in point, see State v. Green, 1931, 78 Utah 580, 6 P.2d 177, at page 186, where the court said:

"While an accused is not entirely relieved from responsibility for the commission of a crime on account of insanity unless the insanity be of such a nature and degree that he did not know the nature or quality of his acts, or that he did not know the act was wrong, or that his mind was so impaired by disease that he was unable to control his act, nevertheless a mental disease falling short of any of these effects may, where a particular intent is a necessary element of a higher degree of a crime, have the effect of reducing the degree of such crime. If the appellant was so afflicted with insanity that he was 'mentally incapable of deliberating or premeditating, and to entertain malice aforethought, and to form a specific intent to take the life of the deceased, in such event the jury should not find him guilty of murder in the first degree.' The language just quoted is the law announced by this court in the case of State v. Anselmo, 46 Utah 137, 148 P. 1071. While the defense urged in the Anselmo case was intoxication, the law there announced is equally applicable where, as here, the defense of insanity is made an issue."

See, also, Ingles v. People, 1933, 92 Colo. 518, 22 P.2d 1109; and the very recent case of Washington v. State, 1957, 165 Neb. 275, 85 N.W.2d 509, 512, which con-

tains a particularly pertinent quotation from People v. Moran, 1928, 249 N.Y. 179, 163 N.E. 553, as follows:

> "Feebleness of mind or will, even though not so extreme as to justify a finding that the defendant is irresponsible, may properly be considered by the triers of the facts in determining whether a homicide has been committed with a deliberate and premeditated design to kill, and may thus be effective to reduce the grade of the offense."

Interestingly enough, on the same day that the Nebraska court announced its decision, the Supreme Court of Nevada decided the case of Fox v. State, 1957, 73 Nev. 241, 316 P.2d 924, which is directly contrary to the Nebraska holding. Nevada is one of the states which refuses to allow any liberalization of the M'Naghten Rule, and, with all due respect to that court, it would appear that the court "labored mightily" in coming to the conclusion which it did. Let it suffice to say that, to us, the better-reasoned, more just and practical are the decisions of the courts which adopt the rule which is well stated by the Supreme Court of Colorado in Battalino v. People, 1948, 118 Colo. 587, 199 P.2d 897, 901:

> "The question to be determined is not whether defendant was insane, but whether the homicidal act was committed with deliberation and premeditation. The evidence offered as to insanity may or may not be relevant to

that issue. * * * 'A claim of insanity cannot be used for the purpose of reducing a crime of murder in the first degree to murder in the second degree or from murder to manslaughter. If the perpetrator is responsible at all in this respect, he is responsible in the same degree as a sane man; and if he is not responsible at all, he is entitled to acquittal in both degrees. However, evidence of insanity, or rather, *evidence of the condition of the mind* of the accused at the time of the crime, together with the surrounding circumstances, may be introduced, not for the purpose of establishing insanity, but to prove that the situation was such that a specific intent was not entertained—that is, *to show absence of any deliberate or premeditated design.*' "

To us, it would appear that if the intoxication and narcotic drug rule is proper, so also is the rule as to mental disorders. We, of course, have no way of knowing what would have been the reaction of the jury if the requested instruction had been given, and it may very easily be there would have been no change in the verdict. However, as we view the evidence, the defendant was entitled to the proffered instruction and it was error on the part of the trial court to refuse the same.

The attorney general argues that the jury could have found under the instructions as given that the defendant was not capable

of such deliberation and premeditation as would constitute first degree murder. Such an argument would have much greater force if the court had not given the instruction as to intoxication and use of marijuana. However, as stated, such instruction is required under our prior holdings. The issue covered by the tendered instruction was upon one of the defendant's theories of the case, and as long as there was evidence introduced to support it (and we believe that there was), it was the duty of the court to direct the jury's attention to the facts which the defendant contends constituted a defense, and not submit a mere abstract statement of the law. State v. Jones, 1948, 52 N.M. 235, 195 P.2d 1020.

It is also contended by the state that the law in New Mexico has been settled by State v. White, supra, and to make any additional change in our rule will result in difficulties insofar as jury administration. We feel that such an argument lacks merit and that a jury, under proper instructions from the court, will have no more difficulty applying this rule than they did in the past. On the contrary, it might be of considerable aid to jurors in further understanding such matters. Certainly any juror who is able to follow through the labyrinths involved in the definitions of deliberation, premeditation, or perhaps proximate cause, should have no difficulty whatsoever in understanding an instruction such as that tendered by the defendant.

It is to be regretted that it will become necessary for the defendant to be retried, with the additional expense and time of the participants involved. However, if we in New Mexico are to keep abreast with modern trends of the law, and in this particular instance the law relating to diseases· of the mind, we have no alternative but to reverse the case, no matter how outrageous a crime may have been committed by this defendant.

Having determined that the case must be reversed and the defendant granted a new trial, it is not necessary for us to consider at length the other matters raised by the defendant. However, as an aid to the trial court in the retrial of this case, we will briefly discuss the other points raised by the defendant.

II.

 The state called as a witness a psychologist, and he was allowed to testify as to the making of certain psychological tests with respect to the defendant and to state his opinion of the defendant's sanity as a result thereof. The defendant claims that a psychologist, as such, should not be allowed to testify as an expert regarding the insanity of the defendant. The basis of this claim is substantially that only physicians, surgeons and psychiatrists are competent to give their opinion as to insanity. The defendant also urges that

even if the testimony of a properly qualified psychologist could be admitted in evidence, that in this particular case the witness was not properly qualified and therefore the court abused its discretion.

It is only within comparatively recent times that questions as to psychologists' testifying as experts has arisen. The most cited case with respect thereto is People v. Hawthorne, 1940, 293 Mich. 15, 291 N. W. 205. In that case, a concurring opinion by six of the nine justices of the Supreme Court of Michigan dealt with the question and held (although concurring with the court's opinion for other reasons) that a properly qualified psychologist should be allowed to testify as an expert. The above mentioned opinion followed the reasoning in People v. Rice, 1899, 159 N.Y. 400, 54 N.E. 48. See, also, People v. McNichol, 1950, 100 Cal.App.2d 554, 224 P.2d 21; In re Masters, 1944, 216 Minn. 553, 13 N.W.2d 487, 158 A.L.R. 1210; and People v. Horton, 1954, 308 N.Y. 1, 123 N.E.2d 609.

In the concurring opinion in People v. Hawthorne, at page 209 of 291 N.W., the statement is made, which we believe to be a proper one:

"When a non-medic is offered as an expert on subjects in the orbit of medical science, the trial court is put on guard and should take greater precaution in the preliminary inquiry to determine the witness' qualifications and the extent of his knowledge than might be necessary when a graduate of a medical school is proposed. Yet it may well be that for some purposes, as where the issue concerns proper medical treatment, even a licensed physician would not possess sufficient knowledge in a particular branch of his calling to satisfy a trial judge who, within discretionary limits, insists upon a high standard of reliability. There is no magic in particular titles or degrees and, in our age of intense scientific specialization we might deny ourselves the use of the best knowledge available by a rule that would immutably fix the educational qualifications to a particular degree."

Macdonald, Psychiatry and the Criminal, p. 162, in considering the whole field of psychological testing and the testimony of a psychologist, says:

"Psychological tests administered by a qualified and experienced psychologist make a valuable contribution to the total psychiatic [sic] examination of a criminal suspect. * * * As the value of a psychological test is no greater than the training and skill of the person who uses it, the trial court is entitled to scrutinize carefully the qualifications of the psychologist before accepting him as an expert witness.

* .* * * * *

"It is important to be aware of the limitations as well as the merits of psychological tests. It would be unreasonable to demand of the psychologist a decision as to criminal responsibility. In some cases he may be able to answer this question but not invariably, as there is no psychological test designed to determine the criminal responsibility of a suspect. A battery of psychological tests may, however, a [sic] provide much useful information in the evaluation of intelligence, personality and clinical diagnosis."

And Macdonald, supra, p. 171:

"The clinical psychologist is not expected to answer questions concerning the M'Naghten Rules in their application to the suspect. He is expected to state what is his opinion concerning the mental status, the diagnosis, the personality and intellectual organization of the suspect based upon the information derived from the psychological tests and any other sources. The clinical psychologist, like the psychiatrist, should be prepared to identify the sources whence he derives his conclusions, and to be specific concerning his procedures and techniques."

We adopt the modern trend of authority in allowing a properly qualified psychologist to give his opinion as an expert as to the result of tests made by him, but that such testimony should be limited to that which the witness is qualified to offer on the basis of his professional training and experience and which he can substantiate by evidence that would be acceptable to recognized specialists in the same field. See Macdonald, supra, p. 172; Medical Trial Technique Quarterly, 1957 Annual, pp. 9–18; 39 Minnesota Law Review 235; 33 Chicago Kent Law Review 230.

This brings us to a consideration of whether or not the trial court abused its discretion in allowing the testimony of the particular psychologist involved.

The determination of the qualifications of an expert is a question for the trial judge and is a matter entrusted to his sound discretion. This discretion will be interfered with only to correct an abuse. Bunton v. Hull, 1947, 51 N.M. 5, 177 P.2d 168; Reid v. Brown, 1952, 56 N.M. 65, 240 P.2d 213; and People v. Hawthorne, supra.

The witness stated his qualifications as to education and practical experience, but nowhere in the record does it appear that the trial court had before it any type of standard by which a comparison could be made of the qualifications of the witness and of a psychologist of recognized qualifications. According to the authorities in the field, the minimum qualifications for a psychologist before being allowed to testify as an expert is that he has had at least five

years of postgraduate training in clinical psychology, has a degree of doctor of philosophy and has spent at least one year as a psychology interne in a mental hospital approved by the American Psychological Association. See Macdonald, supra, p. 162; and Medical Trial Technique Quarterly, 1957 Annual, supra.

New Mexico has not seen fit to establish a certification or licensing law for psychologists, but in the absence of such a statute it is felt that a proffered witness must have at least the minimum qualifications hereinabove stated.

We do not wish to be understood as stating that only those psychologists who meet the minimum standards hereinabove mentioned should be allowed to testify as an expert, as in exceptional circumstances there might be a witness offered who, by reason of exceptionally broad experience and training, might be just as qualified as one who has a doctor of philosophy degree. However, this would be a matter for the determination of the trial court, and it would be put on its guard and should take greater than ordinary precaution in the preliminary inquiry to determine the witness' qualifications and extent of his knowledge. Nor should anything stated herein be construed as a limitation on the right of a lay witness to testify as to matters observed by him.

The witness in this case did not have a Ph.D. degree and also lacked the required postgraduate training in clinical psychology and the necessary experience in an approved mental institution. Therefore, we hold that the trial court committed error in allowing the witness to testify as an expert.

### III.

Defendant's fifth and sixth points of claimed error relate to the confession made by the defendant and the court's refusal to instruct the jury that if there was a reasonable doubt as to the defendant's sanity, then his confession should have been disregarded.

As to the confession itself, we have many times considered the duty of the trial court with respect thereto, and the rule is well stated in State v. Lindemuth, 1952, 56 N.M. 257, 243 P.2d 325, 331, as follows:

"Whether or not confessions should go to the jury 'is in the first instance a question of law for the determination of the court.' (Citations)."

The record at the trial is clear that the period of interrogation was not unduly long, being only two and a half hours, during which time the defendant was given food and drink. There was no showing of any threat, promise or abuse in any sense or that the defendant did not understand English, and, although it is not contended that the defendant was "any mental giant," he was advised of his rights, and under our prior holdings we see no error on the part

of the trial court in the admission of the confession in evidence.

Therefore, the court having determined as a matter of law that the confession should not be excluded from the jury, it thereby became admissible and the duty was then upon the court to properly instruct the jury as to what consideration they might give to it. It is with regard to the failure of the court to instruct as requested by the defendant that an additional error was committed.

It would appear that the trial court's instructions 19, 20 and 21 fairly well advise the jury that it may take into consideration the mentality and intelligence of the accused at the time of making the alleged confession. These instructions, together with the other instructions on reasonable doubt, certainly pointed out to the jury their duty in regard to the mentality of the defendant as it might affect his confession.

However, a careful study of the instructions as given makes it appear that the instructions were aimed at the issue of whether or not the confession was free and voluntary, without explaining the legal effect of claimed insanity at the time of the making of the confession. The defendant, in submitting his requested instruction, sought to have the court instruct the jury to the effect that if they believed the defendant insane at the time of the making of the confession, or had a reasonable doubt as to his sanity, then, and in that event, the confession should be completely disregarded. There appears to be no question but that a confession by an insane person is no confession at all. See State v. Campbell, 1923, 301 Mo. 618, 257 S.W. 131; and People v. Shroyer, 1929, 336 Ill. 324, 168 N.E. 336, wherein the court stated:

"A voluntary confession necessarily involves a waiver of the constitutional right against self incrimination. A waiver is an intentional relinquishment of a known right. (Citations). An insane person can commit no rational, voluntary act. He can do nothing intentionally. Neither can be [sic] know of his constitutional right. His confession is therefore a nullity."

The issue is not covered by the court's instructions, and although it is not necessary for the court to utilize the exact language requested by the defendant, it is necessary that a proper specific instruction be given concerning this theory of the case. Failure to do so is error. State v. Sanders, 1950, 54. N.M. 369, 225 P.2d 150. Compare State v. Jones, supra.

In view of what has been said, therefore, the case will be reversed and remanded with directions to grant the defendant a new trial; and it is so ordered.

LUJAN, C. J., and McGHEE, COMPTON and MOISE, JJ., concur.