**Vincent E. JENKINS, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 16306.**

United States Court of Appeals
District of Columbia Circuit.

On Rehearing in Banc.

Reargued Feb. 9, 1962.

Decided by Judgment Entered
April 12, 1962.

Opinion Rendered June 7, 1962.

Separate concurring opinion by
Burger, Circuit Judge.

Bastian, Circuit Judge, and Miller,
Chief Judge, dissented with opinion.

Separate concurring opinion by
Fahy, Circuit Judge, with whom Edgerton and Washington, Circuit Judges,
concurred.

Mr. Gerald Golin, Washington, D. C. (appointed by the District Court) for appellant.

Mr. Anthony G. Amsterdam, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., Charles T. Duncan, Principal Asst. U. S. Atty., and Harry T. Alexander, Asst. U. S. Atty., at the time the brief was filed, were on the brief, for appellee. Messrs. Nathan J. Paulson and David J. McTague, Asst. U. S. Attys., also entered appearances for appellee.

Messrs. Arthur B. Hanson, Dean Farrington Cochran and Samuel J. L'Hommedieu, Jr., Washington, D. C., filed a brief on behalf of American Psychological Association, as *amicus curiae,* urging reversal.

Mr. Warren E. Magee, Washington, D. C., filed a brief on behalf of American Psychiatric Association, as *amicus curiae,* urging affirmance.

Before WILBUR K. MILLER, Chief Judge, EDGERTON, PRETTYMAN, BAZELON, FAHY, WASHINGTON, DANAHER, BASTIAN and BURGER, Circuit Judges, sitting *in banc.*

BAZELON, Circuit Judge.

Appellant relied solely upon the defense of insanity in a jury trial which culminated in his conviction for housebreaking with intent to commit an assault, assault with intent to rape, and assault with a dangerous weapon. He al-

leges that the District Court erred in (1) determining his competency to stand trial, (2) excluding diagnostic opinions of two defense psychiatrists on the ground that their opinions were without "proper basis," (3) instructing the jury to disregard the testimony on three defense psychologists that appellant had a mental disease or defect on the ground that "a psychologist is not competent to give a medical opinion as to a mental disease or defect," and (4) depriving him of a fair trial by conducting a lengthy and disparaging examination of some expert witnesses.

### I. The Facts

The record discloses the following pertinent information. After indictment, appellant was committed to the District General Hospital for a mental examination on September 4, 1959, to determine his competency to stand trial and his condition at the time of the alleged offense.[1] Appellant was given a series of psychological tests on October 20 and 22, 1959, by staff psychologists under the supervision of the Chief Psychologist, Dr. Bernard I. Levy. Appellant scored 63, high moron, on the I.Q. section of the tests. He was also interviewed three or four times by Dr. Richard Schaengold, Assistant Chief Psychiatrist. Appellant's test performance and his "dullness and inability to relate correctly" led Dr. Schaengold to consider and reject the possibility of undifferentiated psychosis in favor of a diagnosis of mental defect: a basic, unchanging deficiency in brain function.[2] His findings were confirmed by Dr. Mary V. McIndoo, District General's Chief Psychiatrist, on the basis of interviews on November 23, 24 and 25, and a review of appellant's history and test results. By letter of November 25, 1959, signed by Dr. Schaengold and countersigned by Dr. McIndoo, the District Court was advised that appellant was "suffering from an organic brain defect resulting in mental deficiency and impaired

1. See generally Winn v. United States, 106 U.S.App.D.C. 133, 270 F.2d 326 (1959).

2. Durham v. United States, 94 U.S.App. D.C. 228, 241, 214 F.2d 862, 875, 45 A.L. R.2d 1430 (1954).

judgment. He is, therefore, psychotic, incompetent, and incapable of participating in his own defense." Appellant was adjudicated incompetent to stand trial on the basis of this report and was committed to "Saint Elizabeths Hospital until he is mentally competent to stand trial pursuant to Title 24, Section 301, District of Columbia Code, 1951 Edition, as amended August 9, 1955."

At St. Elizabeths, Dr. Lawrence Tirnauer, a staff psychologist, administered another battery of psychological tests on February 25 and March 2, 1960, in which appellant scored 74 on the I.Q. section. Dr. Tirnauer concluded that appellant was suffering from schizophrenia. Thereafter Dr. David J. Owens of St. Elizabeths interviewed appellant several times, "probably [for] fifteen or twenty minutes," and saw him at a staff conference on October 3, 1960. Dr. Owens found no evidence of mental disease or defect. He classified appellant as "a borderline intelligence." Dr. William G. Cushard, another psychiatrist at St. Elizabeths, who saw appellant at the staff conference, reviewed the test reports and agreed with Dr. Owens' findings. Dr. Margaret Ives, Chief Psychologist at St. Elizabeths, was also present at the staff conference. Subsequently, she reviewed Dr. Tirnauer's test results and appellant's past history and administered one part of a six-part Szondi profile test. She agreed with Dr. Tirnauer that appellant "had a mental illness by name of schizophrenia."

Ten days later, the Acting Superintendent of the Hospital notified the District Court that "it has been determined that he [appellant] is, at this time, mentally competent to stand trial and to consult with counsel and assist properly in his own defense. He is not suffering from mental disease * * *. Although he is not suffering from mental deficiency, he has only borderline intelligence." Upon appellant's objection to this report, the court conducted a hearing on November 4, 1960, wherein appellant was found competent and ordered to stand trial.

In preparation for their testimony at trial, Drs. McIndoo and Schaengold noted the later and different diagnosis and the apparent change in appellant's I.Q. reported by the St. Elizabeths psychologists. They requested Dr. Levy of their staff to re-test appellant in order to reconsider their diagnoses that he was mentally defective on June 10, 1959, the date of the alleged offenses. This time appellant scored 90 on the I.Q. test, an improvement inconsistent with mental defect. In reporting this result, Dr. Levy, who had previously been unable to make a diagnosis, concluded that upon review of all test data appellant "is psychotic and schizophrenic." Considering this report in the light of the hospital record and "reports" from St. Elizabeths, Drs. McIndoo and Schaengold revised their previous diagnoses without seeing appellant again. Dr. McIndoo concluded that appellant was schizophrenic, and Dr. Schaengold diagnosed his condition as undifferentiated psychosis.

## II. Admissibility of the Psychiatrists' Opinions

The trial court, *sua sponte*, excluded the revised diagnoses of Drs. McIndoo and Schaengold and instructed the jury to disregard testimony of the three defense psychologists that appellant had a mental disease when he committed the crimes charged.

We discuss first the exclusion of Dr. Schaengold's testimony. After questioning him at great length about the basis of his revised opinion, the court ruled: "All I will allow is that in his opinion on June 10, 1959 [the date of the alleged offenses], the defendant was mentally defective"; it excluded Dr. Schaengold's later diagnosis of mental illness because "there isn't any testimony here that is based on any proper evidence that he was suffering from a mental disease. I am not going to allow it on the basis of a report of a psychologist." The court gave no further explanation.

The Government suggests that the ruling rests on the familiar principle that an expert witness' knowledge of "basic

facts" must be adequate to support his conclusion.[3] It urges that the later psychological reports could not provide Dr. Schaengold with such information, "absent a personal re-examination of appellant," since thirteen months had elapsed between his personal examination of appellant and his revised diagnosis. The proposition seems to be that a psychiatric witness may not rely on psychological test reports unless he has considered them in conjunction with a contemporaneous personal examination. We are aware of no authority for such a rigid and artificial stricture.[4]

Dr. Schaengold, whose expert qualifications were unquestioned, testified that he could arrive at a valid diagnosis on the basis of an earlier examination and later test reports. The court must be deemed to have rejected this statement. We find no basis for such action. We think it clear that Dr. Schaengold's ability to make the revised diagnosis without conducting a personal re-examination presents a question for the consideration of the jury, under appropriate instructions, in assessing the weight of his testimony and not a question for the court upon which it may rest exclusion of the diagnosis as a matter of law.

It is at least as likely, however, that the court predicated its ruling on cases which bar an expert's opinion based upon facts not in evidence unless it is derived solely from his own observations.[5] But we agree with the leading commentators [6] that the better reasoned authorities admit opinion testimony based, in part, upon reports of others which are not in evidence but which the expert customarily relies upon in the practice of his profession.[7] The Wisconsin Supreme Court has forcefully stated the policy underlying the application of this rule to medical testimony:

"In order to say that a physician, who has actually used the result of * * * tests in a diagnosis * * * may not testify what that diagnosis was, the court must deliberately shut its eyes to a source of information which is relied on by mankind generally in matters that involve the health and may involve the life of their families and of themselves—a source of information that is essential that the court should possess in order that it may do justice between these parties litigant.

"This court * * * will not close the doors of the courts to the light which is given by a diagnosis which all the rest of the world accepts and acts upon, even if the diagnosis is in part based upon facts which are not established by the sworn testimony in the case to be true" [Sund-

---

3. Toho Bussan Kaisha, Ltd. v. American Pres. Lines, Ltd., 265 F.2d 418, 76 A.L.R. 2d 1344 (2d Cir. 1959); Haug v. Grimm, 251 F.2d 523 (8th Cir. 1958). The Government cites United States v. Alker, 260 F.2d 135, 155 (3d Cir. 1958), cert. denied, 359 U.S. 906, 79 S.Ct. 579, 3 L.Ed. 2d 571 (1959), where the proposition appears as dictum.

  The Government's reliance upon Blunt v. United States, 100 U.S.App.D.C. 266, 275, 244 F.2d 355, 364 (1957); and Carter v. United States, 102 U.S.App.D.C. 227, 236, 252 F.2d 608, 617 (1957), is misplaced since our discussion of the absence of detailed testimony concerning the underlying basis for the psychiatrists' opinions related to the weight of the testimony and not its admissibility.

4. Cf. Williams v. United States, 104 U.S. App.D.C. 277, 278, 261 F.2d 743, 744

(1958), where we held that a new trial would be required if appellant could establish his allegations concerning newly discovered evidence of changed psychiatric opinion "without additional examination of appellant."

5. E. g., People v. Black, 367 Ill. 209, 10 N.E.2d 801 (1937) (alternative holding); Equitable Life Assur. Soc'y v. Kazee, 257 Ky. 803, 79 S.W.2d 208 (1935) (dictum). See generally McCormick, Evidence § 15 (1955).

6. McCormick, Evidence § 15 (1955). See 3 Wigmore, Evidence § 688 (3d ed. 1940).

7. Taylor v. Monongahela Ry., 155 F.Supp. 601, 604 (W.D.Pa.1957), aff'd per curiam, 256 F.2d 751 (3d Cir. 1958); Sundquist v. Madison Ry., 197 Wis. 83, 221 N.W. 392 (1928); Schooler v. State, 175 S.W.2d 664 (Tex.Civ.App.1943). .

quist v. Madison Ry., 197 Wis. 83, 221 N.W. 392, 393 (1928).]

The record in this case confirms the well-known practice of psychiatrists of relying upon psychologists' reports in aid of diagnosis.[8] And it shows that Dr. Schaengold's changed diagnosis did not rest solely on the later test reports which were not in evidence when he testified,[9] but also upon his own earlier examination.[10] This diagnosis was "the type of clinical opinion he is accustomed to form and to rely upon in the practice of his profession. * * * Though [his] conclusions were not mathematically demonstrable certainties, neither were they mere conjectures, suspicions or hunches." Blunt v. United States, 100 U.S.App.D.C. 266, 275, 244 F.2d 355, 364 (1957).

■ It follows from the foregoing that the court's *sua sponte* exclusion of Dr. Schaengold's testimony concerning his changed diagnosis was error.[11] Since the exclusion was clearly prejudicial, the conviction must be reversed for a new trial.[12]

Appellant also objects to the similar exclusion of Dr. McIndoo's revised diagnosis. She testified that the later tests induced her to change her opinion. But when the court, in very extensive questioning, made clear its view barring reliance upon psychological test reports, she stated that she "did not have a medical opinion about the new diagnosis."

At one point she said, "I'm strictly confused now." Later the following occurred:

THE COURT: Would you express an opinion as to a person's mental condition on the basis of a report given to you by a psychologist?

THE WITNESS: I do, Your Honor, very frequently.

THE COURT: Without even seeing the patient?

THE WITNESS: In most cases I do see the patient. This person I had seen. He was showing certain signs and symptoms. I made a wrong diagnosis. The suggested diagnosis from a psychologist explains my wrong diagnosis.

Since the new trial required by the exclusion of Dr. Schaengold's testimony will afford an opportunity for clarification of Dr. McIndoo's testimony in light of our earlier discussion, we think it unwise to engage in the speculation required to resolve the meaning of her testimony at the trial under review. Hence we refrain from deciding whether the court erred in excluding her opinion.

### III. Admissibility of the Psychologists' Opinions

■ The next assignment of error we discuss concerns the court's instruction to the jury to disregard testimony of

8. Hidden v. Mutual Life Ins. Co., 217 F. 2d 818, 821 (4th Cir. 1954); Scheflen, The Psychologist as a Witness, 32 Pa.Bar Ass'n Q. 329, 333 (1961). See McDonald, Psychiatry and the Criminal 162 (1958).

9. Such reliance would amount to offering an opinion of another in violation of the hearsay rule. Cf. McCormick, Evidence § 15 (1955).

10. Dr. Schaengold testified that he considered undifferentiated psychosis a possibility when he first examined appellant. The improvement in appellant's I.Q. scores was inconsistent with mental defect, and induced Dr. Schaengold to abandon that diagnosis in favor of undifferentiated psychosis which was consistent both with his earlier clinical observations and the later test reports. An opinion so formulated is admissible.

Cf. Williams v. United States, supra note 4. Any infirmity arising out of Dr. Schaengold's failure to re-examine appellant would go to the weight and not to the admissibility of his opinion. Cf. Brill v. Mushinsky, 90 U.S.App.D.C. 132, 194 F.2d 158 (1952).

11. See Hidden v. Mutual Life Ins. Co., supra note 8; Watts v. State, 223 Md. 268, 164 A.2d 334 (1960) (alternative ground).

12. In holding Dr. Schaengold's testimony admissible, we do not intimate approval of his failure to re-examine appellant. Compare Winn v. United States, 106 U.S. App.D.C. 133, 270 F.2d 326 (1959); Carter v. United States, 102 U.S.App.D.C. 227, 236, 252 F.2d 608, 617 (1957); Blunt v. United States, 100 U.S.App.D.C. 266, 275, 244 F.2d 355, 364 (1957).

three defense psychologists that appellant had a mental disease when he committed the crimes charged. Although appellant failed to object to this instruction, we consider it because it presents a question which is likely to arise upon a new trial.[13]

The first psychologist, Dr. Tirnauer, administered a battery of tests to appellant, studied his case history, and concluded he had been suffering from schizophrenia when he committed the crimes. In his opinion, the disease and the crimes were "related." The second psychologist, Dr. Margaret Ives, had reviewed Dr. Tirnauer's test results, had seen appellant at a staff conference, and had administered part of a Szondi profile test. She stated that appellant was suffering from schizophrenia and that his crimes were the product of the disease. The third psychologist, Dr. Levy, interpreted test results obtained by members of the District General staff in October 1959, and administered two additional tests shortly before trial. He testified that defendant had been suffering from schizophrenia on June 10, 1959, but could give no opinion concerning the relationship between the illness and the crimes. At the conclusion of the trial the court instructed the jury:

> "A psychologist is not competent to give a medical opinion as to a mental disease or defect. Therefore, you will not consider any evidence to the effect that the defendant was suffering from a mental disease or a mental defect on June 10, 1959, according to the testimony given by the psychologists."

■ The trial court apparently excluded these opinions because psychologists lack medical training. We agree with the weight of authority, however, that some psychologists are qualified to render expert testimony in the field of mental disorder.[14]

We begin by placing this problem in the context of the considerations governing the reception of expert testimony.

> "An observer is qualified to testify because he has firsthand knowledge which the jury does not have of the situation or transaction at issue. The expert has something different to contribute. This is a power to draw inferences from the facts which a jury would not be competent to draw. To warrant the use of expert testimony, then, two elements are required. First, the subject of the inference must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman, and second, the witness must have such skill, knowledge or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth. The knowledge may in some fields be derived from reading alone, in some from practice alone, or as is more commonly the case, from both. [McCormick, Evidence § 13 (1954), citing authorities.]"

■ The test, then, is whether the opinion offered will be likely to aid the trier in the search for truth. In light of that purpose, it is hardly surprising that courts do not exclude all but the very best kind of witness. See 2 Wigmore, Evidence § 569 (3d ed. 1940). Accord: Fightmaster v. Mode, 31 Ohio App. 273, 167 N.E. 407 (1928). Thus a general practitioner may testify concerning matters within a medical specialty if his education or experience, or both, involves demonstrable knowledge of the subject. Sher v. DeHaven, 91 U.S.App.D.C. 257,

13. Villaroman v. United States, 87 U.S. App.D.C. 240, 184 F.2d 261, 21 A.L.R. 2d 1074 (1950).

14. See Hidden v. Mutual Life Ins. Co., supra note 8; Watson v. State, 161 Tex. Cr.R. 5, 273 S.W.2d 879 (1954), rev'd on other grounds on rehearing. People v. Hawthorne, 293 Mich. 15, 291 N.W. 205 (1940) (dictum); State v. Padilla, 66 N.M. 289, 347 P.2d 312, 78 A.L.R.2d 908, (1959) (dictum). See generally, Scheflen, supra note 8; Louisell, The Psychologist in Today's Legal World, 39 Minn.L.Rev. 235 (1955).

199 F.2d 777, 36 A.L.R.2d 937 (1952), cert. denied, 345 U.S. 936, 73 S.Ct. 797, 97 L.Ed. 1363 (1953); 2 Wigmore, op. cit. supra. Nor need a skilled witness on a medical subject be duly licensed to practice medicine. Ibid. The general rule is that "anyone who is shown to have special knowledge and skill in diagnosing and treating human ailments is qualified to testify as an expert, if his learning and training show that he is qualified to give an opinion on the particular question at issue." "It is not essential that the witness be a medical practitioner." 32 C.J.S. Evidence § 537 (1942). Thus, non-medical witnesses who have had experience in electrical work may testify to the effects of electrical shock upon the human body. Vessels v. Kansas City Light & Power Co., 219 S.W. 80 (Mo.Sup.Ct.1920); Blakeney v. Alabama Power Co., 222 Ala. 394, 133 So. 16 (1931). Optometrists, whose training includes instruction in the symptoms of certain eye diseases, may testify to the presence of cataract discovered in the course of fitting glasses, Jackson v. Waller, 126 Conn. 294, 10 A.2d 763 (1940), and to the effect of a scar upon vision. Black Starr Coal Corp. v. Reeder, 278 Ky. 532, 128 S.W.2d 905 (1939). A toxicologist has been permitted to testify to the effect of oxalic acid, a poison, upon the human eye. Reynolds v. Davis, 55 R.I. 206, 179 A. 613 (1935). The kinds of witnesses whose opinions courts have received, *even though they lacked medical training and would not be permitted by law to treat the conditions they described,* are legion. The principle to be distilled from the cases is plain: if experience or training enables a proffered expert witness to form an opinion which would aid the jury, in the absence of some countervailing consideration, his testimony will be received.

Suggesting the diagnostic category into which an accused's condition fits, and relating it to his past behavior require skill far in excess of that possessed by laymen. Lest the jury be misled into relying on opinions which are not based upon relevant learning and experience, we must examine the reality behind the title "psychologist." Many psychologists may not qualify to testify concerning mental disease or defect. Their training and experience may not provide an adequate basis for their testimony. Some psychologists, for example, teach and engage in theoretical research in fields unrelated to the diagnosis and treatment of mental disease. Others are employed in personnel administration, still others advise industry on problems of employee morale. See Western Personnel Institute, Opportunities for Psychologists, Psychiatrists, Psychiatric Social Workers 8–10 (1958); Daniel and Louttit, Professional Problems in Psychology 250–52, 297 (1953). Such experience does not ordinarily provide the skill essential to offer expert testimony concerning mental disorders. Cf. Albee, Mental Health Manpower Trends 116 (1959). Some psychologists, moreover, have had no post-graduate instruction. Id. at 121–22.

On the other hand, the Ph.D. in Clinical Psychology involves some—and often much—training and experience in the diagnosis and treatment of mental disorders. Typically, candidates are trained, *inter alia,* in general psychology, theory of personality and psychodynamics, psychopathology, diagnostic methods, therapeutic techniques, selected aspects of physiology and anatomy, and clinical methods. A one-year internship in a mental hospital is required for this degree.[15] After graduation, many clinical psychologists administer and interpret diagnostic tests which elicit the patient's intellectual level, defenses, personality structure, attitudes, feelings, thought and perceptual processes. See 1 Rapa-

15. See Report of the Committee on Training in Clinical Psychology of the American Psychological Association, in 2 Am. Psychol. 539, 543–58 (1947). The Association certifies only those programs meeting the standards laid down in this report.

port, Diagnostic Testing 7–9 (1945). In many institutions and clinics their reports, which regularly include opinions concerning the presence or absence of mental disease or defect,[16] are important aids to psychiatrists who customarily have the final responsibility for diagnosis. Some psychologists, moreover, regularly administer psychotherapy and related non-organic therapies in the treatment of certain types of mental disorders.[17]

■■■ The determination of a psychologist's competence to render an expert opinion based on his findings as to the presence or absence of mental disease or defect must depend upon the nature and extent of his knowledge. It does not depend upon his claim to the title "psychologist." And that determination, after hearing,[18] must be left in each case to the traditional discretion of the trial court subject to appellate review.[19] Although there are no statutory criteria for licensing psychologists in the District of Columbia to assist trial courts,[20] the American Psychological Association's list of approved graduate training programs provides some guidance. When completion of such training is followed by actual experience in the treatment and disagnosis of disease in association with psychiatrists or neurologists, the

opinion of the psychologist may properly be received in evidence.

■■■ Some graduate clinical psychologists, moreover, are certified by the American Board of Examiners in Professional Psychology.[21] Certification, which indicates exceptional professional competence, is awarded upon completion of written and oral examinations in, *inter alia,* diagnosis and treatment.[22] Applicants must have four years, acceptable professional experience and must present credentials, including a sample of their work and letters of recommendation, showing sufficient professional achievement to warrant further examination.[23] The purpose of Board certification is to identify and evaluate psychologists at an advanced professional level. If the postdoctoral experience required for certification has included substantial experience in a hospital or clinical setting in association with psychiatrists or neurologists, clinical psychologists who are diplomates of the American Board of Examiners in Professional Psychology should ordinarily qualify as expert witnesses.

■■ ■■ We need not decide whether the three psychologists who testified for the defense at the trial under review were qualified to offer expert opinions since they may not be called to testify at

16. Scheflen, supra note 8.

17. See Clark, America's Psychologists 188–205 (1957). See also Joint Commission on Mental Illness and Mental Health, Action for Mental Health 244–50 (1961).

18. The court may conduct this hearing in the presence of the jury unless special circumstances warrant its exclusion.

19. Cf. Pollard v. Hawfield, 83 U.S.App.D.C. 374, 170 F.2d 170 (1948), cert. denied, 336 U.S. 909, 69 S.Ct. 514, 93 L.Ed. 1073 (1949). Compare State v. Padilla, 66 N.M. 289, 347 P.2d 312, 78 A.L.R.2d 908 (1959). See also McDonald, supra note 8.
The qualification of a particular witness to testify as an expert is largely within the domain of the trial judge. Particular inquiries which may be appropriate in some cases may be inappropriate in others. The majority of this court

think the matter should be left to the sound judicial discretion of the trial judge, with no more specific guidance than is contained in this opinion.

20. Such statutes are in force in several states. See, e. g., Conn.Gen.Stat.Ann. §§ 20–188 to 20–191 (1960); Md.Ann.Code Art. 43 §§ 618–620, 629–636 (1957); Mich.Stat.Ann. §§ 14.677(3)–14.677(11) (Supp.1959), Pub.Acts 1959, No. 257.

21. Kelley, Sanford & Clark, The Meaning of the ABEPP Diploma, 16 Am.Psychol. 132–34 (1961). Prior to 1949, the Board waived the Ph.D. or examination requirements, or both, if a candidate was judged qualified on the basis of training, professional experience and his colleagues' endorsements. Id. at 132.

22. Id. at 134, 138.

23. Id. at 134.

the retrial.[24] We hold only that the lack of a medical degree, and the lesser degree of responsibility for patient care which mental hospitals usually assign to psychologists, are not automatic disqualifications. Where relevant, these matters may be shown to affect the weight of their testimony, even though it be admitted in evidence. The critical factor in respect to admissibility is the actual experience of the witness and the probable probative value of his opinion. The trial judge should make a finding in respect to the individual qualifications of each challenged expert. Qualifications to express an opinion on a given topic are to be decided by the judge alone.[25] The weight to be given any expert opinion admitted in evidence by the judge is exclusively for the jury.[26] They should be so instructed.

### IV. Competency to Stand Trial

■ Another ground urged for reversal is that the November 4 order adjudicating appellant competent to stand trial was not authorized by D.C.Code § 24–301(b). That section provides, in substance, that when an accused person "is restored to mental competency" and when the hospital superintendent so certifies, the court may enter an adjudication of competence "unless the accused or the Government objects, in which event, the court, after hearing without a jury, shall make a judicial determination of the competency of the accused to stand trial." Emphasis supplied. Here, the Superintendent did not certify that appellant's competency had been "restored" but rather that appellant "is, at this time, mentally competent." Upon

appellant's objection, the court conducted a hearing in which Dr. David J. Owens, a hospital psychiatrist, testified that appellant was not a mental defective, and that there was no indication of organic brain injury or mental illness. His testimony clearly implied that appellant had been competent when committed. Appellant presented no evidence, and the court adjudicated him "mentally competent to stand trial."

Appellant contends that the statute applies only to cases of "restored competency" and cannot be invoked, as here, to set aside an original adjudication of incompetency. He argues that an adjudication of "restored competency" was precluded by the evidence at the hearing which showed only that appellant's condition was unchanged.

Clearly the determination of appellant's eligibility to stand trial may be established by a finding of "restored competency" or a finding that he never was incompetent. Assuming, arguendo, as appellant implies, that a proceeding to set aside the original adjudication of incompetency is required, we think the substance of such proceeding was provided by the hearing conducted below. Appellant does not claim that he was surprised or otherwise prejudiced by the Government's evidence that he never was incompetent.

Appellant's remaining contention concerns the conduct of the trial court in questioning certain expert witnesses. Since this issue may not arise upon the new trial, we do not consider it.

The judgment of conviction is reversed and the case is remanded to the District

24. The trial judge might have concluded that one or more of the three defense psychologists were competent to testify as experts. All are clinical psychologists; all hold doctoral degrees from institutions approved by the American Psychological Association; all are associated with psychiatrists and neurologists in a hospital setting in the diagnosis and treatment of mental illness. Two were chief psychologists at the hospitals where they were employed, and the third had diagnosed more than a hundred patients during his three years at St. Elizabeths.

25. Sher v. De Haven, 91 U.S.App.D.C. 257, 199 F.2d 777, 36 A.L.R.2d 937 (1952), cert. denied, 345 U.S. 936, 73 S. Ct. 797, 97 L.Ed. 1363 (1953).

26. O'Donnell v. Geneva Metal Wheel Co., 183 F.2d 733 (6th Cir. 1950), cert. denied, 341 U.S. 903, 71 S.Ct. 612, 95 L.Ed. 1342 (1951).

Court for further proceedings in accordance with this opinion.[27]

Reversed and remanded for a new trial.*

FAHY, Circuit Judge (concurring).

Having joined in the opinion issued October 26, 1961, reversing and remanding for a new trial, I join now in similar action taken by the court after rehearing en banc. I concur generally in the opinion, adding the qualifications to be stated.

While, strictly speaking, it is not necessary, as the present opinion states, to decide whether the three psychologists who testified for the defense at the trial were qualified to offer expert opinions, since they may not be called to testify at the retrial, it would be altogether appropriate to pass upon their qualifications on the record before us; for the record is here for our review of the rulings of the District Court in excluding their testimony. Upon the reasoning of both the original and the present opinions, considered with the facts, I would hold that these witnesses were qualified. A ruling to that effect now would be useful to the District Court.

The main feature of the present opinion, however, is its holding that psychologists may qualify as experts on the question of mental disease or defect under the standards set forth in the opinion. I am in entire agreement with this, which was the gist of the opinion of the division prior to the rehearing en banc.

I am authorized to say that Judges EDGERTON and WASHINGTON join in the views above expressed.

BURGER, Circuit Judge (concurring).

I concur in the remand because the court's basic holding that a psychologist is not barred as a matter of law from giving expert testimony about mental diseases makes it essential that we have a comprehensive record before us on the education and training of psychologists in general and clinical psychologists in particular. This is emphasized by recalling that appellant's entire case in this court, including his oral argument, was based on matter *outside* the record in the form of recitals of what various writers thought on the subject of whether, and to what extent, psychologists should be permitted to testify relating to mental *disease*. Similarly the majority opinion relies largely on "the literature." The literature cited and relied on by the appellant, and indeed by the majority opinion originally, was and is now a series of references selected to support one or the other point of view. They were not developed in the record by an adversary process or subjected to adversary examination. The reason we now remand is to have a record made in an orderly way and in that process authoritative texts, or parts thereof, may well be offered and received, subject, of course, to the established rules of evidence.

At the outset certain factors should be kept in mind. The issue is not now and never was whether a psychologist's testimony is admissible in litigation where "sanity" is in issue. Such testimony has long been admissible in the form of psychological tests and the analysis and explanation of such tests by a psychologist. No one doubts that such matter is admissible. The real issue in dispute is whether the clinical psychologists in this case, by which we mean persons having degrees of Doctor of Philosophy in Psychology, and also additional training as clinical psychologists, are competent in a scientific sense and hence legally qualified

(1) to make a diagnosis of the existence and character of a mental disease, and

(2) whether there is a causal relationship between a disease and an unlawful act.

The issue can be stated also in terms of whether *medical* opinions and *medical*

27. See note 19 supra.

* The retirement of Senior Circuit Judge Prettyman became effective April 16, 1962. Prior thereto he concurred in the foregoing opinion and joined in the judgment entered April 12, 1962.

648

diagnoses can be made by and be the subject of expert testimony by a Doctor of Philosophy in Psychology with added clinical experience. For convenience I will hereafter refer to such a psychologist as a Clinical Psychologist.

While the issue is new to this court it is not new to medicine and psychiatry. In 1954 a Resolution was adopted by the American Medical Association, the Council of the American Psychiatric Association and the Executive Council of the American Psychoanalytical Association to the effect that psychologists and other related professional groups were autonomous and independent in matters where *medical* questions were *not* involved, but

that where *diagnosis* and *treatment* of mental illness was involved the participation of psychologists "must be co-ordinated under medical responsibility." [1] This Resolution, while not controlling on the courts is plainly entitled to great weight.

My difficulty with the opinion of the majority, as distinguished from the remand for additional evidence, is that it fails to give adequate guidance as to the scope and nature of the inquiry to be conducted by the trial judge on remand. I agree that it is entirely within the discretion of the District Court whether he should conduct the hearing out of the presence of the jury. In this particular

1. The Resolution in full is as follows:

"For centuries the Western world has placed on the medical profession responsibility for the diagnosis and treatment of illness. Medical practice acts have been designed to protect the public from unqualified practitioners and to define the special responsibilities assumed by those who practice the healing art, for much harm may be done by unqualified persons, however good their intentions may be. To do justice to the patient requires the capacity to make a diagnosis and to prescribe appropriate treatment. Diagnosis often requires the ability to compare and contrast various diseases and disorders that have similar symptoms but different causes. Diagnosis is a continuing process, for the character of the illness changes with its treatment or with the passage of time, and that treatment which is appropriate may change accordingly.

"Recognized medical training today involves, as a minimum, graduation from an approval [sic] medical school and internship in a hospital. Most physicians today receive additional medical training, and specialization requries [sic] still further training.

"Psychiatry is the medical specialty concerned with illness that has chiefly mental symptoms. The psychiatrist is also concerned with mental causes of physical illness, for we have come to recognize that physical symptoms may have mental causes just as mental symptoms may have physical causes. The psychiatrist, with or without consultation with other physicians, must select from the many different methods of treatment at his disposal those methods that he considers appropriate to the particular patient. His treatment may be medicinal or surgical, physical (as electroshock) or

psychological. The systematic application of the methods of psychological medicine to the treatment of illness, particularly as these methods involved gaining an understanding of the emotional state of the patient and aiding him to understand himself, is called psychotherapy. This special form of medical treatment may be highly developed, *but it remains simply one of the possible methods of treatment to be selected for use according to medical criteria for use* when it is indicated. Psychotherapy is a form of medical treatment and does not form the basis for a separate profession.

"Other professional groups such as psychologists, teachers, ministers, lawyers, social workers, and vocational counselors, of course, use psychological understanding in carrying out their professional functions. Members of these professional groups are not thereby practicing medicine. *The application of psychological methods to the treatment of illness is a medical function.* Any physician may utilize the skills of others in his professional work, but he remains responsible, legally and morally, *for the diagnosis and for the treatment of his patient.*

"The medical profession fully endorses the appropriate utilization of the skills of psychologists, social workers, and other professional personnel in contributing roles in settings directly supervised by physicians. It further recognizes that these professions are entirely independent and autonomous *when medical questions are not involved;* but when members of these professions contribute *to the diagnosis* and treatment of illness, their professional contributions must be co-ordinated *under medical responsibility.*" (Emphasis added.)

case, since this is an exploratory process, there are probably valid practical reasons to hold the hearing out of the presence of the jury although once we resolve the basic problem, that process would not be necessary in future cases.

As I see it, the hearing to be conducted in this case will be somewhat unusual because of the nature of the question and the need for a comprehensive record of testimony. The practical reason for conducting this particular hearing out of the presence of the jury is that the hearing could well take several days. It is not a question which can be resolved simply by examination of the particular psychologists whose testimony is offered. The preliminary hearing on qualifications will be enlarged if the District Judge allows, as he might well do, participation by the several amici curiae, who are highly qualified to be of aid to the court. That would be a dubious process for every future case but entirely appropriate for this case. We have said that the conduct of the hearing lies in the sound discretion of the trial judge. But it is not enough to say that it is within the sound discretion of the trial judge and at the same time fail to reflect just what we are driving at.

We must bear in mind that there is a difference between the holdings "that some psychologists are qualified to render expert testimony in the field of mental disorder" (see note 14 majority opinion) and the question of a psychologist's competence to make a diagnosis of *mental disease*. The former proposition is, as we have noted, widely accepted; the latter is not—and it is the latter we are now exploring.

On remand I assume broad areas are to be explored and should be explored in order to give the trial judge, in the first instance, and this court if need be, an evidentiary basis and a record on which to act. As I see it, the remand

hearing ought to cover among other things the following:

(a) The scope, nature and extent of the education of a Ph.D. in Psychology and in Clinical Psychology, including time spent in hospitals, with patients, and under what supervision.

   (1) What is the education, training and clinical experience of the proffered witness?

   (2) Define for the record the term "clinical experience."

(b) What, in particular, is the extent and scope of this Clinical Psychologist's clinical education in physiological and medical subjects? How does it compare with that of a psychiatrist?

(c) What is the scope of the work of Clinical Psychologists at St. Elizabeths Hospital?[2]

   (1) Do they make diagnosis of mental diseases on their own independent responsibility or only subject to the supervision of a psychiatrist? The relationship should be developed fully.

   (2) What is the scope of the work and extent of clinical responsibility of the particular Clinical Psychologist with patients *independent* of psychiatrists? That is, what work is done fully by the Clinical Psychologist alone and without regard to any supervision or overseeing by a psychiatrist?

(d) In how many specific cases has the particular Clinical Psychologist made a diagnosis of mental disease, prescribed or supervised treatment of patients without the

**2.** In this connection an obviously well qualified expert, who might well be called as a witness by the court, if he is not called by any party, is the Superintendent of St. Elizabeths Hospital who has presided over a staff of psychiatrists and clinical psychologists dealing with precisely the issues of criminal responsibility.

intervention or approval of a psychiatrist?

(e) In how many cases approximately (whether at St. Elizabeths or elsewhere) has the witness made a diagnosis of the existence or non-existence of mental disease and communicated that diagnosis directly to the patient or patient's family independent of a psychiatrist?

(f) To what extent has the witness prescribed or supervised treatment of mental patients independent of a psychiatrist?

(g) The opinions of both psychiatrists and clinical psychologists ought to be made part of the record on the following:

(1) In what kinds or categories of mental disease are the physiological and medical factors not of any consequence?

(2) In what categories does a diagnosis of mental disease involve analysis, understanding and synthesis of physical and physiological factors as well as psychological factors?

(3) If diagnosis of mental disease always involves consideration of or evaluation of physical, biological or physiological data, how does a clinical psychologist acquire clinical experience and scientific competence to make such diagnosis?

(4) What is a differential diagnosis in the context of diagnosis of mental disease?

(5) Is the process of diagnosis of mental disease the elimination of various alternative explanations?

(6) In this process what factors must be taken into account?

(7) In the process of eliminating alternative explanations do the medical history of the patient, the physical examination and various medical tests play a part?

(8) Can any mental disease be diagnosed without taking into account pathological data? If so, what mental diseases can be diagnosed independent of and without regard to pathological data?

The cases cited by the majority concerning the optometrist, the toxicologist and other skilled specialists who are not medical doctors are not in any real sense relevant. Indeed they tend to divert us from the central issue. Of course an optometrist or the toxicologist is permitted to give *some* expert testimony within his competence just as a skilled shoemaker might be qualified to testify from long observation and experience as to the effect of wearing certain kinds of shoes, or a farrier to give expert testimony about the effect of certain types of shoeing on horses.

The heart of our problem is not whether a clinical psychologist is qualified to testify as an expert, for of course he is in some areas, but whether he is qualified to give expert testimony in the form of a diagnosis of a mental disease or illness, and to express an opinion on whether a stated mental disease "caused" the patient to commit a given unlawful act or "produced" that act. More rationally the question ought to be whether mental disease so substantially affected him that he was unable to control his conduct.

I agree with the majority that the scope of the training of the psychologist is of critical importance and that many factors other than academic degrees go to the admissibility and weight of the expert testimony. For example, if a general medical practitioner testified on the subject of mental disease, and gave a diagnosis of presence or absence of mental illness in opposition to a trained psychia-

trist it would obviously be proper for the trial judge to tell the jury they could take into account the differences in training and experience in weighing the testimony of the one against the other. In the same way it would be proper, if a clinical psychologist is found qualified to testify as to the presence or absence of a mental disease and does so in opposition to a psychiatrist, to tell the jury they could take into account the difference in the education, training and experience of psychologists and psychiatrists and the absence of medical training in the former.

BASTIAN, Circuit Judge, with whom WILBUR K. MILLER, Chief Judge, joins, dissenting.

In the early morning of June 10, 1959, the complaining witness was in her apartment alone, in the process of getting ready to go to work that day, when she heard a knock at her front door and, upon partially opening it, she found herself face to face with the appellant. He showed her a card, saying something about an address. Then he suddenly burst into the apartment, knocked her to the floor, stuffed a gag into her mouth, and informed her he was going to rape her. When she began to fight back at her attacker, kicking and scratching at him as best as she could, he proceeded to punch her into unconsciousness with his fists. When she regained consciousness, she found herself lying on her apartment floor, disheveled, badly beaten, and bleeding profusely. She had been stabbed with a sharp instrument, presumably a knife, a number of times, causing severe loss of blood and necessitating subsequent surgery. As a result of this ordeal she remained hospitalized for approximately six weeks. In the District Court, a jury convicted appellant of housebreaking, assault with intent to commit rape, and assault with a dangerous weapon.

In reversing this conviction, the majority of this court, without adequately discussing the real nature and present medical understanding of mental illness, hold *inter alia* that certain psychologists can qualify to give *expert* opinion concerning the existence *vel non* of a mental disease or defect and its connective relationship, if any, to criminal behavior. We cannot agree. In our opinion it should be an absolute condition precedent to expert testimony as to a medical diagnosis that the witness be a medical doctor.

In the first place, we think it must be concluded beyond doubt that the existence of a mental disease or defect is, first and foremost, a *medical* problem. The ascertainment of such a medical illness in a given individual with reference to kind, quality, degree and influence is, except in extreme cases, a highly unverifiable process, judged by any objective standard, even when undertaken by a *medical* doctor with years of special training in the detection of medical disturbances of the mind. Time and time again, where insanity is raised as a defense at the trial of criminal cases in this jurisdiction, sincere and experienced *psychiatrists* have taken the stand and voiced diametrically opposite opinions as to whether or not the defendant had a mental disease or defect at the time he committed the crime charged against him. And even when these psychiatrists are in some agreement that the defendant had a mental disease or defect at the time of the crime, they frequently differ widely concerning its symptoms, nature, intensity, and causal influence with respect to the offense committed.

Our emphasis of this situation is not to belittle the integrity of the psychiatrists who testify at these trials, nor to disparage the integrity of the psychiatric profession, but merely to illustrate how nebulous and uncertain is the issue of mental illness even to those of the *medical* profession who are experienced and trained in its diagnosis and treatment. If the issue is so debatable among conceded professional medical experts, it is sheer folly, in our opinion, to attribute to a lay psychologist, who admittedly is not a doctor of medicine, such

presumptive medical knowledge and diagnostic acuity as to entitle him to wear in a criminal courtroom the badge of an expert witness with respect to the existence of that elusive *medical* condition known as mental disease or defect.

By this we do not mean to suggest that a psychologist should never be called upon to testify in insanity cases. In proper circumstances, testimony concerning the results of psychological tests administered to a defendant should be admissible as a means of enlightening a jury with respect to the specific information contributed by the psychologist to the over-all mass of information ultimately utilized by the medically trained psychiatrist in arriving at an expert opinion concerning the medical diagnosis of mental disease or defect. But to say that a psychologist is qualified to give an expert opinion with reference to a medical diagnosis is, in effect, to say that a non-medical witness can render an expert answer to a medical question on the strength of information insufficient to resolve it.[1] Such an opinion is a conclusion by guesswork, as far as a valid and proper medical determination is concerned.

We are not alone in our views on this precise issue. The American Psychiatric Association, an organization "comprised of those twelve thousand qualified Doctors of Medicine who specialize and practice as psychiatrists," in its amicus curiae brief, urges this court not to allow psychologists to qualify as experts to express opinions. We find in the brief this pertinent observation in regard to the proper medical ascertainment of mental disease or defect:

"The diagnostic synthesis of *all data* collected is properly carried out only by an individual Doctor of Medicine with a broad training, experience, and familiarity with *all* of the areas indicated, and the diagnosis must reflect a comprehensive medical judgment in which the proper weight is given to all of the data available. Further, we know of no mental illness which does not have a biological as well as a psychological component. No facet of the data can be assumed to reflect the total diagnosis until viewed in the context of the total picture. A clinical psychologist, lacking *medical* training and the specialization required of the qualified psychiatrist, is not qualified to make this total *medical* diagnosis or to testify as a *medical* expert thereon." [Emphasis appears in amicus brief.]

The majority of the court ignores the above quoted wise counsel from the only undisputed experts now at work in the area of medical illness of the mind. In doing so, the court, we suggest, is bypassing all objective criteria in reaching the highly questionable and subjective conclusion that lay psychologists, whose opinions are predicated on the basis of test results, may qualify as experts on the medical question of the diagnosis of mental disease or defect, as well as experts concerning the causal relationship between a particular defendant's mental abnormality, as such may be "diagnosed" by these psychologists, and that defendant's criminal activity. In our opinion, the holding of the majority on this issue is wholly untenable. We would affirm the judgment and sentence of the District Court.

---

1. It is well to remember that a psychologist's opinion in this respect is grounded basically upon his interpretation of the results of certain psychological tests administered to the defendant. As an example of the instability of such test results, we mention that in the instant case the appellant was subjected to the same I.Q. test on three separate occasions, scoring, respectively, 63 (high moron), 74 (borderline defective), and 90 (average).