## HAZEL *v.* STATE

[No. 22, September Term, 1961 (Adv.)]

*Decided July 25, 1961.*

The cause was argued before BRUNE, C. J., and HAM-
MOND, PRESCOTT, HORNEY and MARBURY, JJ.

*Milton B. Allen* and *Jacques E. Leeds* for appellant.

*William J. McCarthy, Assistant Attorney General,* with
whom were *Thomas B. Finan, Attorney General, Joseph S.
Kaufman, Deputy Attorney General, Saul A. Harris* and
*John C. Weiss, State's Attorney* and *Assistant State's At-
torney,* respectively, of Baltimore City, on the brief, for ap-
pellee.

HAMMOND, J., delivered the opinion of the Court.

Hazel, the appellant, was tried on a charge of rape by the
Criminal Court of Baltimore, three judges sitting without a
jury. He was found sane and guilty as charged, and sen-
tenced to death. In the appeal to this Court sanity was not
an issue, the sole question argued and decided being the suffi-
ciency of the evidence to support the finding of guilt. The
judgment was affirmed in *Hazel v. State,* 221 Md. 464.

After the affirmance, and within weeks of the day Hazel

was to have been executed, the court-appointed lawyers who had represented him at his trial filed on his behalf a petition for relief under the Post Conviction Procedure Act, based on two grounds, one essentially factual, the other legal. First, they alleged that information which had come to them since the trial established that there had been a deprivation of due process of law at the trial in that officials of the State—the psychiatrist who was superintendent at Crownsville, and a young psychiatrist on its staff—(a) had given the trial court the false impression that there was no disagreement among the Crownsville medical staff or elsewhere in the Department of Mental Hygiene that Hazel was sane, when they knew, as a fact, that two members of the staff had "misgivings" as to Hazel's sanity under psychiatric standards (although not under the Spencer-McNaghten Rule standard), and (b) had not informed the court that the Director of Correctional Psychiatry of the Department of Mental Hygiene, Dr. Morgenstern, who had concurred in the original conclusion of the Crownsville staff that Hazel was not sane had not been advised that the original conclusion had been revised, and was still of the opinion that it had been correct. The second ground was that the trial court lacked jurisdiction to try and convict Hazel because the controlling statute, Code (1957), Art. 59, Sec. 11, expressly required the report as to sanity to be made to the court by the Department of Mental Hygiene, and it had been made by the Superintendent of Crownsville.

Judge Warnken denied post conviction relief and we granted leave to appeal in *forma pauperis*.

The contentions now made on appeal are the same as were made to Judge Warnken. On the first point he found as a fact from the testimony before him that there had been no false testimony, or knowledge of the State witnesses, that Dr. Morgenstern did not agree with the revised conclusions as to Hazel's sanity. On the question of law he concluded that the jurisdiction of the Criminal Court of Baltimore did not depend upon literal compliance with the provisions of Art. 59 of the Code (as well as that the accepted practice had been for the Superintendents of the various mental institutions to make sanity reports to the courts as the representatives of

the Department of Mental Hygiene). This conclusion was confirmed, after he had reached it, by the decision of this Court in *Hamilton v. State,* 225 Md. 302.

Judge Warnken's opinion reviews and deals with the contentions of the appellant, factual and legal, in such detail and with such perceptive accuracy that, after that thorough consideration of the record which a capital case demands and receives, we have decided that it should be adopted as the opinion of the Court and, as such, reproduced in the official report.

However, one aspect of the case should be amplified, although what is hereafter said is implicit in Judge Warnken's findings.

If it be assumed that Dr. Ward's sincere statement there was no disagreement among the staff as to Hazel's sanity, was incorrect and had the same effect as a material misstatement knowingly made, or left uncorrected, nevertheless, because the assumed mistake was not prejudicial, there resulted neither a denial of due process nor any other ground for relief under *coram nobis* (one of the remedies for which the Post Conviction statute, Code (1960 Cum. Supp.), Art. 27, Sec. 645A, is a substitute) as there might otherwise have been. *People v. Fisher,* 192 N. Y. S. 2d 741, 746 (Ct. Gen. Sess. N. Y. Co.) ; *Alcorta v. Texas,* 355 U. S. 28, 31; *Napue v. Illinois,* 360 U. S. 264, 270, 272; *United States v. Baldi,* 195 F. 2d 815 (C. A. 3), cert. den. 345 U. S. 904.

Dr. Morgenstern in his memorandum to his superior on August 14, 1959, complaining that he was not consulted nor told of the change in diagnosis, said he was still of the opinion Hazel *"at the time of the conference* was mentally ill * * *." He has not examined Hazel, reviewed the Crownsville files nor consulted anyone about Hazel since July 15, 1959. He has never said to anyone, or ever testified, that he thinks the ultimate diagnosis of sanity was wrong. Dr. Morgenstern's complaint was that he had not been consulted further before Hazel was sent to court for trial, not that an insane man had been tried, convicted and sentenced to death. We cannot and do not believe Dr. Morgenstern would have remained silent, save for a complaint as to departmental procedure or protocol,

and never, to this day, have said Doctors Ward, Ramirez, Phillips and Guttmacher had reached a wrong result, if he believed an insane man was about to be executed. We find nothing to indicate that if the trial judges had known that Dr. Morgenstern had not in fact acquiesced in Dr. Ward's report and conclusions prior to the trial in the criminal court (as Dr. Ward and Hazel's lawyers justifiably believed) the result would have been different.

For the reasons set forth in Judge Warnken's opinion, as here amplified, the order appealed from will be affirmed.

*Order affirmed.*

OPINION AND ORDER OF JUDGE WARNKEN.

Clifford E. Hazel was convicted of rape by Judges Tucker, Carter and Sodaro, without a jury, on August 11, 1959, and was sentenced to death by lethal gas on August 14, 1959. The verdict included a finding that he was sane at the time of the commission of the crime and sane at the time of the trial. The judgment of conviction and sentence imposed was affirmed by the Court of Appeals on February 17, 1960, where the sole question presented was whether the evidence was sufficient to prove that he raped the prosecuting witness. *Hazel v. State,* 221 Md. 464. No question was raised there as to his sanity. At both trials he was represented by court appointed counsel, Messrs. Milton B. Allen and Jacques E. Leeds. The same counsel prepared and filed on behalf of Hazel, on May 6, 1960, a Post Conviction Procedure petition in which the relief prayed is that the findings of sanity and guilt be stricken out and a retrial be had after an appropriate examination and report by the Department of Mental Hygiene. After the filing of an amended petition a hearing was held at which numerous witnesses testified. Some weeks later when the hearing was resumed so that a deposition of an absent witness could be read in evidence an amendment of the amended petition was filed and the case was submitted by counsel without argument.

The jurisdiction of the trial court is challenged under the Federal (14th Amendment) and Maryland (Article 23) con-

stitutions. Specifically and briefly stated, it is contended: (1) That the jurisdiction of the court to proceed with the trial was dependent upon findings and a report of the Department of Mental Hygiene, pursuant to Article 59, section 11 of the Code, as to the sanity of the petitioner, that such report was not furnished and if it had been the petitioner would not have been subjected to trial. (2) That the testimony of Dr. Ward, Superintendent of Crownsville State Hospital, "was incorrect and false" and if the actual facts had been produced in court, the petitioner would not have been subjected to trial. (3) That the court was misled by state officials, Drs. Ward and Ramirez, "who knowingly allowed the court to exclude from its consideration information peculiarly within their (the officials) knowledge, which would have resulted in the defendant petitioner not coming to trial on August 7, 1959, or resulted in a finding of insanity had he come to trial."

1. Petitioner bases the lack of jurisdiction of the trial court on the alleged failure to comply with Article 59, section 11 of the Code. The exact point is that the report to the court as to the sanity of petitioner was furnished by Dr. Ward, Superintendent of Crownsville State Hospital, instead of the Department of Mental Hygiene. Article 59 is headed "Lunatics and Insane." Section 16 abolished the Board of Mental Hygiene and provided that "There shall be a Department of Mental Hygiene under the direction of the Commissioner of Mental Hygiene, with full power and authority to supervise, direct and control all State institutions caring for or treating persons of unsound mind and with such other rights, powers, duties, obligations and functions as are now or hereafter may be conferred upon the Department or the Commissioner by law." The Commissioner of Mental Hygiene is directed to "make rules and regulations, * * * as he may deem proper and necessary for the administration of the Department and the State institutions under its direction and control."

As the Department of Mental Hygiene, as such, is not defined in Article 59 I assume it is a method of designating a department of the state government consisting of the Com-

missioner of Mental Hygiene and such personnel as he may appoint to assist him. At the trial I endeavored to ascertain who constituted the Department of Mental Hygiene and whether there was any written designation of the members thereof by the Commissioner of Mental Hygiene but no one seemed to know. Dr. Morgenstern, hereinafter more fully referred to, seemed to indicate that ultimately he was the Department of Mental Hygiene in so far as the requirements of section 11 are concerned, although he styled his position as Director of Correctional Psychiatry of the Department of Mental Hygiene.

As section 11 incorporates by reference some part of sections 7 and 9, the purpose and relevancy, if any, of each to this case will be briefly mentioned. Section 7 primarily concerns the method of pleading insanity and the duty of the jury or court in rendering a verdict where such a plea is filed. It concludes by giving the court power, before trial, to order an examination of the mental condition of the defendant by the Department of Mental Hygiene and prescribes the manner in which such an examination shall be made.

Section 9 provides that as to any person charged with the commission of a crime, the court *may* cause the Department of Mental Hygiene to inquire whether such person is insane or lunatic, or of such mental incapacity as to prevent him from properly conducting his defense. If the finding is that he is so incapacitated, the court shall, *in its discretion,* direct him to be confined in a mental institution until he shall have recovered and shall stay the proceedings against him until that time, and upon recovery the court shall proceed with the trial.

Section 11 gives a judge of any court or a justice of the peace having criminal jurisdiction, as to any person brought before him charged with any offense and who is committed in default of bail, the power to commit such person *either* to a mental institution *or* to jail to await further proceedings *if* he appears to be or is alleged to be insane or lunatic. If such person is committed to a mental institution the Department of Mental Hygiene is required to determine whether he is insane or lunatic and within two weeks report its findings

to the court or justice. If the Department shall find such person insane or lunatic, he shall remain in a mental institution *until he shall be tried* or until the court shall *in its discretion* give the direction provided for in section 9 (set out above). In all cases not punishable by death or confinement in the penitentiary the examination provided for in this section and in sections 7 and 9 may be made by the superintendent of the mental institution in which the person may be confined pending trial, instead of the Department of Mental Hygiene.

It is quite clear that these sections impose no preliminary requirement or condition to proceeding with the trial of a person charged with the commission of a crime even though he appears to be or is alleged to be insane. They merely provide the court with means to obtain information as to sanity if it desires it for such use it cares to make of it. Whether to seek such information and its action thereafter is entirely discretionary. Jurisdiction to proceed with the trial is in no wise affected. The power of the court to validly commit the accused to a mental institution and to stay the trial is given upon an affirmative finding of incapacity by the Department of Mental Hygiene. In the absence of such power and finding the legal place of confinement would doubtless be jail pending trial. Section 11 permits, in certain cases, the finding and report as to sanity to be made by the superintendent of the mental institution rather than the Department of Mental Hygiene. But whether made by one rather than the other or by neither, or if the court decides not to wait for the report, its right to proceed with the trial is not constitutionally or by statute prevented. A finding of insanity by the Department of Mental Hygiene would not oust the court of jurisdiction to proceed with the trial and adjudicate that issue. Even if it be assumed, for the sake of argument, that the court should not have proceeded with the trial without a report from the Department of Mental Hygiene rather than receiving Dr. Ward's report, its action could only be a procedural error which must be timely raised, and if rejected the only redress is by a motion for new trial or an appeal. The latter was taken but the point was not made and the

affirmance of the judgment by the Court of Appeals has foreclosed the question. Contentions which go to the regularity, rather than to the validity of the proceedings, cannot be raised by habeas corpus or Post Conviction Procedure. *Dwyer v. Warden,* 223 Md. 641, 162 A. 2d 726, is one of the latest of numerous cases which so hold.

With respect to the provisions of section 11 which seem to mean that the examination and report in capital and penitentiary cases shall be made by the Department of Mental Hygiene, there is a real conflict between Drs. Ward and Tuerke on the one hand and Dr. Morgenstern on the other, as to what constitutes a report by the Department. Dr. Ward testified that Dr. Morgenstern is not the representative of the Department of Mental Hygiene, but that in such matters the Department is represented by the hospital and the superintendent of the hospital where the accused is confined. He also said that it has been the custom for the official opinion to be furnished by the Superintendent of the hospital; and that the hospital's opinion can only be given by him and not by the staff. He said "this is the way we function" and that he still acts as though the superintendent of the hospital represents the Department of Mental Hygiene. Dr. Ward also said when Dr. Morgenstern has participated in a staff examination of an accused, he always sends him a copy of the report which he furnishes to the court, so that if Dr. Morgenstern differs with it he can also present his opinion to the court. Dr. Ward stated that Dr. Morgenstern functions as consultant to the mental hospitals but carries no administrative authority and that he has no responsibility over the hospitals and does not have to be called when a patient is permitted to leave the hospital.

Dr. Tuerke, who is now the Commissioner of Mental Health, testified that while he was superintendent of Springfield State Hospital he followed the practice testified to by Dr. Ward with respect to capital and penitentiary cases. Against the above is the testimony of Dr. Morgenstern that he is the supervisor of staff conferences dealing with forensic cases which come from a court to a hospital for discussion, evaluation and report back to the court. He also indicated

that the report required by law of the Department of Mental Hygiene must be made by him. I find from all the testimony that the practice has been in accordance with the testimony of Drs. Ward and Tuerke. This conflict at least shows how fortunate it is that the jurisdiction of the court is not dependent upon such a slender reed as the answer to the question of whether the report as to sanity of the petitioner, which the court received, was made by the Department of Mental Hygiene.

2 and 3. These contentions of the petitioner require a review of the facts in the order of their occurrence. On June 1, 1959, petitioner pleaded not guilty. Upon request of his counsel, petitioner was referred to Dr. Guttmacher, Chief Medical Officer of the Supreme Bench, on June 11th by Judge Byrnes. On June 22nd his counsel stated to Judge Byrnes that Dr. Guttmacher advised that he was unable to complete in the time required a fair evaluation of petitioner's mental status and they requested that he be referred to Crownsville State Hospital for examination and report. Counsel said they understood it could be done in two or three weeks and they had tentatively agreed with the State's Attorney for the trial to be held on July 20th. Judge Byrnes thereupon committed petitioner to Crownsville for examination "under Article 59, section 11" and he was transferred to that institution on June 24th. In a letter to Judge Byrnes dated July 17, Dr. Ward stated that "in spite of our efforts [we] have not been able to reach a conclusion which we would feel valid" and "it would be impossible for us to render an opinion" by July 20th and requested that "the patient be allowed to remain with us until we feel that we know him well enough to give a clear-cut opinion to the court." A carbon of the letter shows on the bottom, "cc Dr. Morgenstern, Dr. Guttmacher, Dr. Phillips and Dr. Ramirez."

Dr. Ward's letter was apparently based on a written report prepared by Dr. Ramirez, dated July 17th, of the Forensic Staff meeting of July 15th. It shows those present as: Dr. Morgenstern, Dr. Farinholt and Dr. Phillips in addition to Dr. Ramirez. The report is a full page single spaced description of the meeting of the staff with petitioner and the

latter's appearance and actions thereat. It concludes with the statement that "It was felt that this patient is suffering from a schizophrenic reaction of a catatonic type, even though there are some prominent paranoid features about it"; also that he "will be kept under observation and will receive further medication and treatment"; that a "record of his complete penal history and of the reason for his not being accepted into military service will be requested" and that "in all probability he will be a long-term treatment case." The carbon copy of the report shows: "cc Dr. Morgenstern and Ward."

On July 21st Judge Carter, who was then presiding in the Criminal Court, acknowledged receipt of Dr. Ward's letter to Judge Byrnes and advised that the trial had been postponed to August 7th as he understood from Dr. Guttmacher "that you will be able to reach a conclusion on or before that date." This was acknowledged by Dr. Ward by letter dated July 24th in which he stated:

"The hospital shall be represented at that trial by Dr. Hector Ramirez one of the staff physicians here who is in charge of the criminal unit in the hospital. Should you wish further testimony either from the Clinical Director, Dr. Phillips, or myself, we would either or both be glad to come."

The copy shows: "cc: Dr. Morgenstern Dr. Guttmacher 'C' Building Medical Records."

Dr. Ward's report is a letter to Judge Carter, dated August 5th, the material part of which is as follows:

"At the time of admission the patient was quiet, seclusive, was difficult to communicate with and he would not or could not volunteer information concerning the alleged crime. His most frequent reply was to the effect that he did not know. This man appeared to be psychoticly depressed. He talked about hearing voices and about having heard voices for a period of years. We talked with members of his family and they also told that the patient had been hearing voices for years. However, there was

an inconsistency in the stories told by each individual member of the family.

On the basis of the above information we were puzzled as to the diagnosis and actually were inclined to believe him to be psychotic. However, approximately one week or ten days ago he talked to one of the hospital attendants and told this attendant that he did commit the crime and he also told the attendant that his conduct at the hospital has been prompted by an attempt to avoid prosecution. We have no reason to believe that the employee in the hospital is not telling the truth.

Subsequently in talking to this patient he recounted the alleged crime and recounted insofar as he could remember and determine his own feelings and thinking at that time. Insofar as we can tell there is no evidence to point to the fact that this man was insane at that time and did not know the difference between right and wrong. We are inclined to believe that he was sane and did know the difference between right and wrong and did know the nature and consequences of his act as related to him.

He mentioned in this description of the occurrences around the crime that he had always felt an uncontrollable impulse to commit robberies and various crimes.

He states that all of his life he has struggled with this but has never been able to actually conquer it or control it. It is our belief that this is a true statement and that the patient has acted on the basis of an uncontrollable impulse. We do not, however, believe this to be psychotic and we do not believe that this would justify an opinion to the effect that he was irresponsible as interpreted in accordance with the present laws of Maryland.

The description of this man has been long and perhaps detailed but we felt however that this explanation was warranted since there had been doubts in our mind concerning this patient."

The copy shows: "cc: Judge Byrnes Dr. Guttmacher Dr. Morgenstern Medical Records."

Incidentally Dr. Guttmacher submitted a report, dated August 3rd, of his examination and conferences with petitioner at the City Jail on June 17th and 18th and at Crownsville on July 17th and 30th. On the latter date some members of the staff of the institution were present. The report consists of 13 single space pages. In part his "Impression" was stated as follows:

> "This Examiner is definitely of the opinion that the patient is a very clever man and an extremely antisocial individual as well as mentally disordered. In his opinion, the patient is thoroughly unreliable and is attempting to make himself appear more psychotic than he is.
>
> The Examiner believes that this patient meets the test of responsibility as laid down by the Spencer case and that he must be considered to have been sane at the time of the offense. He feels that he is fully in touch with reality and can aid his counsel effectively in preparing his defense."

The report of Dr. Guttmacher was offered in evidence by petitioner's counsel at the criminal trial on August 7th.

At the trial Drs. Guttmacher, Ramirez and Ward were called to testify in that order by the State as the "medical evidence * * * because of the fact that the Defendant will have the benefit of the State's psychiatrists." Each of them, out of the presence of each other, as all witnesses were excluded at the request of defendant's counsel, testified to the sanity of the defendant under the Spencer rule and they were vigorously cross examined by his counsel. It appears that his counsel kept in touch with the examination being made of petitioner at the City Jail and at Crownsville. Dr. Guttmacher's report was extensively used in the cross examination of Dr. Ramirez, particularly about the "Truth Serum" test and his report of the Forensic Staff meeting was used by counsel in their examination of him. He was also asked about being under pressure to submit a report but he denied

that further time for observation and study of petitioner was necessary or would have resulted in a different conclusion by him.

Counsel had not only kept in close touch with the progress of the examination of the petitioner but they had summoned and therefore had available at the trial the complete file of Crownsville which contained all clinical records and data and which showed who had contact with the petitioner and that there was no report of a second Forensic Staff meeting. Counsel had also summoned as witnesses Drs. Guttmacher, Ramirez, Ward and Phillips. Notwithstanding the above, the only reference made to the information which was then available was the following in cross examination of Dr. Ward:

"Q Do you feel that the medical staff has had sufficient time in which to make a proper and sufficient determination of this man's real condition, Doctor? A I feel that there has been sufficient time in which to arrive at a correct determination, yes, sir. Otherwise, I would not have made the report.

Q I think your opinion was written as an individual doctor, was it not? A No, sir. It was written as the Superintendent of the Hospital.

Q Well, does that fact mean that the staff was in agreement? A Well, ordinarily, in a case such as this it is usually the case that a staff is in agreement and if the staff happens to be out of agreement with the superintendent, usually, the superintendent can give the opinion. In this case, I would suppose that in some slight degree it can be said that the staff was, or rather, that there was some slight degree of disagreement, but I do not think there was any real clear-cut disagreement on the part of anybody. Certainly, not with the one I wrote."

It appears from the evidence that Drs. Ramirez and Phillips agreed with Dr. Ward as to the sanity of petitioner.

That the meeting of July 15th was the only meeting of the Forensic Staff and the alleged belief of some or all of those present thereat that the petitioner was insane at the time of

the offense and at the date of the meeting, which are the basis for contentions 2 and 3, were evidently known to counsel at the time of the criminal trial. Such knowledge would seem to be implicit in the questions asked Dr. Ward, above quoted. In addition to the above quoted answers of Dr. Ward, he stated at the recent hearing that three things occurred which made it obvious to such extent that petitioner was not insane, that it was not necessary to go back to the staff, viz, (1) the report of the attendant that petitioner said "that the lady he is supposed to have raped was going on a long trip and he thought if he could get this trial put off until she goes he thought it would be of help to him." The State did request that the trial be had because the prosecuting witness intended to leave the country at an earlier date as her husband had been transferred to Germany; (2) the "truth serum" test conducted by Drs. Ramirez and Guttmacher; (3) his (Dr. Ward's) talk with petitioner. All three of the doctors testified at the criminal trial that they found petitioner was malingering and the lack of a final conclusion which they had when the letter of July 17th of Dr. Ward to Judge Byrnes was written was dispelled by additional information including their conferences with and study of the petitioner.

I find from all the evidence that the testimony of Dr. Ward at the criminal trial was not "incorrect and false." Indeed, I think he was sincere and believed what he stated and that he acted in accordance with the practice pursued by him in previous similar cases. I also find there is no evidence to even suggest that the court was misled by Drs. Ward and Ramirez, which is the petitioner's third contention. This is entirely apart from the legal effect of such misrepresentation by state employees who did not conduct the trial and control the nature of the testimony presented, which of course was in charge of the State's Attorney.

As soon as this petition was referred to me I arranged a conference with counsel to fix an early date for the hearing. At the conference Mr. Weiss, Assistant State's Attorney, suggested having the hearing before the three judges who heard the criminal case, but counsel for petitioner refused, which was his legal privilege. Obviously, the judges who

heard the case would be better able than I to determine whether they were misled or if there was any misrepresentation at the trial, although after reading the testimony of the medical witnesses at the criminal trial and giving appropriate effect to the evidence presented at the recent hearing, I have no difficulty reaching the conclusion above expressed.

The present contentions seem to be rather belated efforts to review and revive matters which were known or easily discoverable by ordinary diligence before or at the criminal trial. The newly discovered evidence principle is therefore not applicable. By the time Dr. Ward's (who was the third medical expert) testimony as to sanity was almost concluded, it should have been evident to counsel that petitioner had a lost cause on the issue of insanity unless a way could be found to neutralize or dilute the positive statements of the doctors which were unaffected by forceful and intelligent cross examination. Resourcefulness would suggest ascertaining the reason for the difference in conclusions between July 17th and August 5th with respect to all of those who participated in the staff meeting. There was a lead in the testimony of Dr. Ward about a "degree of disagreement" which was not seized upon and thoroughly developed and explored.

The petition seems to have been prompted by petitioner's counsel having called to their attention a letter from Dr. Morgenstern to Dr. Perkins (then Commissioner of Mental Hygiene) dated August 14, 1959. In it he said he learned from the papers [the press] that Drs. Ward and Ramirez testified in court that the patient was and is sane; that he was not consulted or requested to give his opinion to the court and "I definitely feel I should have been consulted before his release for trial." Also that the only records he received was the committing order and copy of the letter to Judge Byrnes of July 17th. The differences which exist between Dr. Morgenstern and Drs. Ward and Tuerke as to their respective duties and powers in such cases has been stated and need not be repeated. I infer that Dr. Morgenstern believes Dr. Ward tried to keep him uninformed about matters subsequent to the staff meeting of July 15th.

Dr. Morgenstern testified at the recent hearing. He said

he did not receive until August 18th (1) the admission note of Dr. Ferrari dated July 5th, (2) a psychologist report of July 13th, (3) the Forensic Staff report dated July 17th, (4) the letter of Dr. Ward to Judge Carter of July 24th and (5) Dr. Ward's letter to Judge Carter dated August 5th. He said his secretary wrote for a copy of the file on *August 17th* and the papers listed were received on *August 18th*. He knows they were received on the latter date because his secretary told him so and she wrote the fact on the top of each paper. This would be rather quick mail service. He could not explain why on the carbon copy of the letter of July 14th of Dr. Ward to Judge Carter she wrote on the top "Recv'd. 8/18/59" and on the bottom of the letter she wrote that it was received August 14, 1959. His secretary was not produced as a witness. Each of the above papers has the usual legend on it—CC: Dr. Morgenstern.

Dr. Ward's secretary (Mrs. French), no longer employed at Crownsville, testified that she mailed to Dr. Morgenstern a copy of each letter she wrote, as the legend on the copy retained shows, at the same time the original was mailed. Mrs. French specifically identified the letters of Dr. Ward to Judge Byrnes dated July 17th and Judge Carter dated August 5th. Whether they and the other papers were duly received and put aside, or for some reason not shown to Dr. Morgenstern, or whether he was absent from the office examining defendants at some of the county jails, which was part of his duties, or on vacation during the period July 17th to August 7th does not appear. The practice or system of handling such mail in his office was not stated. The testimony of Mrs. French convinced me that the copies were mailed to Dr. Morgenstern. Without the personal (rather than the hearsay) testimony of Dr. Morgenstern's secretary, I am compelled to give effect to the usual presumption that the letters, which were proved to have been mailed, were received.

Points 2 and 3 are almost entirely factual. The serious situation of the petitioner seemed to me to require a full examination and discussion of the evidence which has made this opinion quite lengthy. If any legal questions survive the

factual findings they only relate to the regularity of the proceedings and it is not necessary to cite authorities for the statement that they cannot be raised in this collateral proceeding. I find no violation of constitutional rights.

For the reasons set forth above, the petition is hereby dismissed.

/s/ RALPH WARNKEN
*Judge*

November 30, 1960