## STATE *v.* TULL

[No. 387, September Term, 1964.]

50

*Decided August 20, 1965.*

The cause was argued before HAMMOND, HORNEY, MARBURY, OPPENHEIMER and BARNES, JJ.

*John W. Sause, Jr., Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General, Wade D. Ward, State's Attorney for Somerset County,* and *C. Awdry Thompson, State's Attorney for Dorchester County,* on the brief, for appellant.

*George E. Bahen, Jr.,* with whom were *Hughes & Bahen* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court.

The State has appealed from the granting of a motion for a new trial to the appellee, Tull, filed a month after his judgment and sentence of death for the murder of his wife was affirmed by this Court in *Tull v. State,* 230 Md. 596. At the original trial Tull's real defense was that he was insane at the time of the killing. Both Dr. William G. Cushard, superintendent of Clifton T. Perkins State Hospital, and Dr. John M. Hamilton, its clinical director, testified that Tull was then sane, while Dr. Oscar G. Prado, State-wide director of correctional psychiatry of the Department of Mental Hygiene, who because of personnel shortages at Perkins had been the psychiatrist in charge of Tull at Perkins, testified that he was insane. Some ten months after Tull had been convicted, his lawyers in a chance conversation with one Ralph G. Oropollo, the chief clinical psychologist at Perkins, found that he had given psychological tests to Tull at the hospital, tests which formed a part of the background of the opinions of the respective psychiatrists who testified, and that he had been at the time of the original trial and still was of the same opinion as Dr. Prado, namely that Tull was insane when he killed his wife.

The lawyers thereupon filed a motion for a new trial, alleging that they had discovered subsequent to the trial that "Mr. Ralph Oropollo, a clinical psychologist employed by Perkins State Hospital," was of the opinion that Tull had been legally insane at the time of the commission of the crime for which he

was convicted, and praying that Oropollo's testimony be heard before the court acted. Mr. Oropollo's testimony was received. He gave his name as Ralph P. Oropollo, his profession as clinical psychologist and his employment as chief clinical psychologist at Perkins. Neither his scholastic background and achievements nor his qualifications to pass on the sanity of Tull months before he saw him were given. His opinion was that Tull, when he killed his wife, had been the victim of a "schizo-effective type of schizophrenic reaction" and that "it was my feeling that the patient would fall under the Spencer [M'Naghten] rule." Chief Judge Duer and Judge Taylor said that they were aware of the rule concerning the time within which motions for new trials have to be filed, but that "we are not going to hold to that strict interpretation of the rule * * * in a case as serious as this we don't think that the Court of Appeals would require us to."

Maryland Rule 759 a provides that a motion for a new trial in criminal cases, as in civil, "shall be filed within three days after the reception of a verdict" (such a motion was duly filed within three days after the verdict in the original trial on June 6, 1962, and denied). We held in *Giles v. State*, 231 Md. 387, (in which the sequence of events was almost identical to that here, the second motion for a new trial having been made there some two months after the original judgment and sentence had been affirmed here) that the rule meant what it said and was valid. The apposite language in part was:

> "Maryland Rule 567 a provides that a motion for a new trial 'shall be filed within three days after the reception of a verdict' and subsection e of that Rule provides that 'if a motion for a new trial be not made, within the time prescribed by section a * * * the Clerk shall enter a final judgment as of course.' Since appellants' motion was not filed within three days after reception of the verdict, it was properly denied."

See also *Drehoff v. Warden*, 231 Md. 654, 656; *Cook v. State*, 225 Md. 603, 608; *Carr v. State*, 218 Md. 318, 320; *Johnson v. State*, 215 Md. 333, 336-337.

The trial court had no power to grant a new trial under Rule 759 a.

If the second motion for a new trial is treated as an application for post conviction relief and this appeal as an application by the State for leave to appeal, the result would be the same.

Judges Duer and Taylor said "as we review the testimony of Mr. Oropollo, had he been here on the day of the trial in Cambridge * * * he would have in a sense affirmed the testimony of Dr. Prado. * * * We think without any doubt that perhaps this is important testimony * * *. We think Mr. Oropollo would have been a competent witness to testify."

It is far from clear that Mr. Oropollo would have been a competent witness. There has been and is a sharp disagreement as to whether a clinical psychologist is scientifically competent and hence legally qualified to make a diagnosis of the existence and character of a mental disease or condition and determine accurately whether there was causal relationship between such a disease or condition and an unlawful act. A resolution was adopted in 1954 by the American Medical Association, the Council of the American Psychiatric Association and the Executive Council of the American Psychoanalytical Association,[1] which included this:

> "The medical profession fully endorses the appropriate utilization of the skills of psychologists, social workers, and other professional personnel in contributing roles in settings directly supervised by physicians. It further recognizes that these professions are entirely independent and autonomous when medical questions are not involved; but when members of these professions contribute to the diagnosis and treatment of illness, their professional contributions must be coordinated under medical responsibility."

The three psychiatrists who testified at Tull's original trial seemingly agreed. Dr. Cushard, Dr. Hamilton and Dr. Prado all attended two staff conferences at which Tull's case was discussed and decided. Dr. Cushard explained the mechanics of the

---

1. See footnote 1 of concurring opinion of Burger, J. in Jenkins v. United States (Ct. Ap. D.C.), 307 F. 2d 637, 648.

staff conferences at Perkins in part in this way (E 87—Original Trial Extract) :

"First, I might go back to the point where a patient is first admitted to the hospital. He is examined by a psychiatrist and a preliminary mental examination is done, and a physical. Then later a more extensive history and psychiatric examination is done, or are done, rather. In addition to that there's a psychological examination, social service investigation, and a social worker talks to the patient's own relatives and friends, and various laboratory tests including electroencephalogram to rule out or find out if the person has organic damage to the brain, and any other examinations which may be indicated in the individual case.

"Now then, after all of this information and—all of this information is compiled and related to the total case, he is presented by the doctor who had the case, did the case study, the case is presented, that is, before a staff conference which is attended by the members of the staff and also by the clinical, the psychologists, and the social workers, and the nursing service, and the rehabilitation service, all of whom present their respective observations and what they had learned about the patient. In other words, there is a total and complete presentation as possible of all the information that we have been able to gather during hospitalization.

"The patient is then brought in before the staff and is questioned by the physicians who are present, and the object of this examination is to fill in and complete, or add whatever may be added to, the already available information.

"It affords each physician a chance to ask any questions about which he is not quite clear as to the answers, or any additional information he would like to have, or how the patient is feeling at that time.

"In other words, this examination proceeds until all physicians present are satisfied with the information

available and are ready to form and express an opinion.

"The patient then leaves the staff conference and the various physicians give their opinions regarding the man's mental condition and opinions as to responsibility and so forth."

Dr. Prado testified that Dr. Cushard's description of a staff conference was complete and accurate.

It would appear that the clinical psychologists, like the social workers and representatives of the nursing and rehabilitation services "present their respective *observations*" but do not give opinions, as such, and that the medical men and women "form and express an *opinion*" and then, after the subject leaves, "the various physicians give their opinions regarding the man's mental condition and opinions as to responsibility and so forth."

The Courts have divided on whether a psychologist is qualified to express an opinion as to mental disease or condition, as opposed to giving factually the results of his tests on and observations of the patient. See the cases and text and law review writers referred to in the Annotation "Qualification of nonmedical psychologist to testify as to mental condition or competency," 78 A.L.R. 2d 919, and a full discussion of the subject and authorities in *Jenkins v. United States* (Ct. App. D.C. En Banc), 307 F. 2d 637, in the majority, concurring and dissenting opinions. See also 39 Minn. L. Rev. 235 and 39 Marquette L. Rev. 239, and *cf. Hidden v. Mutual Life Ins. Co.*, 217 F. 2d 818 (4th Cir.). The admissibility of opinion testimony by a psychologist generally is made to turn on the extent of the education, training and experience of the particular nonmedical psychologist offered as a witness. For example, Macdonald, *Psychiatry and the Criminal,* quoted in *State v. Padilla* (N. Mex.), 347 P. 2d 312, 318, says at p. 162:

"It is important to be aware of the limitations as well as the merits of psychological tests. It would be unreasonable to demand of the psychologist a decision as to criminal responsibility. In some cases he may be able to answer this question but not invariably, as there

is no psychological test designed to determine the criminal responsibility of a suspect."

Macdonald adds at p. 171: "The clinical psychologist is not expected to answer questions concerning the M'Naghten Rules in their application to the suspect."

In the *Padilla* case the Court reversed in part because a psychologist without sufficient education, training and experience had been permitted to give his opinion as to the accused's sanity and criminal responsibility. The Court said (p. 318):

> "We adopt the modern trend of authority in allowing a properly qualified psychologist to give his opinion as an expert as to the result of tests made by him, but that such testimony should be limited to that which the witness is qualified to offer on the basis of his professional training and experience and which he can substantiate by evidence that would be acceptable to recognized specialists in the same field. See Macdonald, supra, p. 172; Medical Trial Technique Quarterly, 1957 Annual, pp. 9-18; 39 Minnesota Law Review 235; 33 Chicago Kent Law Review 230.
>
> * * *
>
> According to the authorities in the field, the minimum qualifications for a psychologist before being allowed to testify as an expert is that he has had at least five years of postgraduate training in clinical psychology, has a degree of doctor of philosophy and has spent at least one year as a psychology interne in a mental hospital approved by the American Psychological Association. See Macdonald, supra, p. 162; and Medical Trial Technique Quarterly, 1957 Annual, supra."

The Court added that occasionally a witness might be offered who did not meet these standards but who should be heard because of his "exceptionally broad experience and training."

See also *Jenkins v. United States, supra,* where the Court indicated a broad general agreement, without express reference, with the views expressed in *Padilla,* saying at p. 645 of 307 F. 2d that the proposed witness ordinarily should qualify as an opin-

ion witness if he has a Ph.D. degree in psychology, four or more years of acceptable professional experience in diagnosis and treatment in a hospital or clinical setting in association with psychiatrists or neurologists, and is a diplomate of the American Board of Examiners in Professional Psychology.

Mr. Oropollo gave no evidence or indication of his qualifications other than to testify that he was chief clinical psychologist at Perkins.

It is also far from clear that it would have been reversible error if the trial court had rejected Mr. Oropollo's opinion testimony at the original trial had it then been proffered and was admissible. Dr. Prado's status as chief expert among those then in the employ of the State was brought out at length and stressed before the jury. He testified that in 1957 he became the physician in charge of the Criminal Division of Spring Grove and in 1960 was promoted to his present position as Director of Forensic Psychiatry for the State of Maryland. He examined only the major criminal suspects—those whose alleged crimes are punishable by death or life imprisonment. One duty he had was to attend all staff conferences at which such cases were to be discussed. He had an office or the use of an office in every State mental hospital. Not only did he attend the two staff conferences at which Tull's case was discussed, he was Tull's doctor during the several months Tull was at Perkins and presented the case to the conference. He gave Tull two formal examinations and saw him a number of other times. He referred to copies he held of all findings as to Tull made at Perkins— "Observations from the trained personnel at the hospital, the psychological tests, the social history" (all of which of course was considered by Doctors Cushard and Hamilton). He gave detailed and elaborate reasons why he thought Tull insane in contrast to Doctors Cushard and Hamilton, who did little more than give their conclusions that Tull was sane. Mr. Oropollo was a technician assisting the three doctors. His opinion would have been cumulative and that of one whose status was professionally inferior to the three medical witnesses who did give their views.

In *Williams v. United States*, 312 F. 2d 862, 867, the Court

of Appeals for the District of Columbia noted that although a psychologist had been allowed to testify as to the results of tests she had administered to an accused, her ultimate conclusion that the tests showed organic brain damage had been excluded because, not being a medical doctor, she was not competent to give a medical opinion as to a mental disease, and said:

> "Assuming arguendo that it was error to exclude the conclusions of the psychologist, under our en banc opinion in *Jenkins* rendered June 7, 1962, [307 F.2d 637] we hold that the error was harmless because on this record the witness' opinions would only be cumulative. * * * the same evidence was before the jury in the testimony of several of the psychiatrists, some of whom expressly based their conclusion of organic brain damage on the psychologist's findings."

See also *Hazel v. State,* 226 Md. 254, 259.

We think that the possibility of a different verdict as to Tull's sanity, had Mr. Oropollo's testimony been before the jury, is too slight to require a finding that Tull's trial was fundamentally unfair because it was not presented.

Tull's present claim is essentially only, unadorned, that he has discovered new evidence that might have changed the result if he had known of it in time. This can afford him no relief in a post conviction application; *Daniels v. Warden,* 223 Md. 631; *Diggs v. Warden,* 221 Md. 624; *Barbee v. Warden,* 220 Md. 647, 650; any more than it would have in a habeas corpus case. *Diggs v. Warden, supra,* or in coram nobis, *Madison v. State,* 205 Md. 425, 432. Actually, the new evidence relied on by Tull is not new. It was always available if it had been looked for, as the testimony of Mr. Oropollo below and the testimony of Doctors Cushard and Prado, particularly the latter, makes plain.

There is no allegation, no showing and no indication that the State withheld or suppressed any evidence, which is significant; because if there had been such withholding or suppression of significant or material evidence Tull might be entitled to relief. See *Brady v. State,* 226 Md. 422, *aff'd* 373 U. S. 83; *State*

*v. Giles,* 239 Md. 458; *Coleman v. State,* 221 Md. 30; *State v. D'Onofrio,* 221 Md. 20, and cases cited.

We find no violation of or any affront to any fundamental or basic right of Tull, common law or constitutional, which made his original trial unfair or invalid.

*Order reversed.*