ANTHONY ALOYSIUS SPANN *v.*
ARTHUR ELMER BEES
ET UX.
[No. 978, September Term, 1973.]

*Decided November 15, 1974.*

The cause was argued before MORTON, MOYLAN and MOORE, JJ.

*W. Lee Harrison*, with whom was *Cooper C. Graham* on the brief, for appellant.

*Joseph F. Lentz*, with whom were *Monfred, Lentz & Hooper* on the brief, for appellees.

MOORE, J., delivered the opinion of the Court.

Appellant seeks a reversal of a judgment against him in the total sum of $30,000 entered upon a jury verdict in an automobile negligence case where his liability was admitted. The principal issues presented pertain to the testimony, on behalf of appellee, of a psychiatrist and a psychologist. The thrust of appellant's contentions is that there was no legal evidence of organic brain damage and that the jury should not have been allowed to consider it; that certain opinion evidence of the psychologist was improperly received and that the findings of the psychiatrist as to organic brain damage were essentially infirm because allegedly they were based on the findings of the psychologist. For the reasons hereinafter stated we conclude that these claims of error are without foundation and that the judgment below should be affirmed.

The automobile accident in which the appellee, Arthur E. Bees, sustained injuries occurred on February 4, 1969 in Baltimore County when the motor vehicle operated by the appellant collided with a Volkswagen in which Mr. Bees was a passenger. Appellee was taken to St. Joseph's Hospital in an unconscious condition and when he regained consciousness some six or seven hours later, he had no recollection of the accident nor of the events preceding it and had no recollection thereof at the time of the trial four years later. According to the medical testimony, he sustained a

severe concussion and also a laceration of the left cheek which was closed by seven sutures and another above the right eye which required one suture. He also sustained bruises about the nose and upper lip. The final diagnosis of the family physician, Dr. Donald O. Wood, who saw him at the hospital and at fifteen office visits, was that he had sustained a personality change which was directly related to the accident and that this change was permanent. Dr. Wood prescribed dexedrine beginning in November, 1969 and appellee was receiving the same medication, a dosage of one-half tablet four times a day, at the time of the trial.

The plaintiff-appellee was 47 years of age at the time of the accident, was married and the father of two adult daughters and had been employed for a number of years by Martin-Marietta as an aeronautical engineer. His complaints following the accident and at the time of trial included memory loss, slurred speech, extreme dependence on dexedrine "without which he would go into a shell," become disoriented and highly irritable. Prior to the accident, the testimony of his physician, wife and neighbor was that he was an outgoing, cheerful individual, possessed of an even and pleasant disposition. There was also corroboration of his testimony that his printing, used extensively in his professional work, had become substantially impaired. In addition to the medical testimony of the family doctor, appellee presented as witnesses the aforementioned psychologist and psychiatrist, Dr. Robert L. Granter and Dr. Katherine V. Kemp, respectively. The appellant offered the testimony of Dr. Curtis Marshall, an electroencephalographer, and Dr. Howard Moses, a neurologist, who had examined Mr. Bees at the request of Dr. Wood.

The record discloses no requests by the appellant for instructions to the jury nor objections to the instructions given which were, of course, confined to the sole issue of damages. The jury awarded Mr. Bees the sum of $23,000 and returned a verdict under a *Deems* count [1] for $7,000 plus interest.

---

1. Deems v. Western Maryland Railway Co., 247 Md. 95, 231 A. 2d 514

I

Since the claim of impropriety in receiving the testimony of the psychologist is of critical importance to appellant's contentions, we address ourselves first to this issue.

The psychologist, Robert L. Ganter, had a degree of Doctor of Philosophy in Psychology, and had been on the staff of Spring Grove State Hospital for four years and at the Maryland State Department of Mental Hygiene for two years as Forensic Psychologist. In addition, he had been engaged in private practice as a psychologist for twelve years. Appellee was referred to him by Dr. Charles Rafky, a psychiatrist. The patient was first examined on September 16, 1969, some seven months after the accident, and was seen for reevaluation by Dr. Ganter on May 25, 1972. At the first examination, a series of psychological tests was administered. These tests included: The Wechsler Adult Intelligence Scale, the Wechsler Memory Scale, the Rorschach or Ink Blot Test, the Eisenson test for Aphasia, the Bender-Gestalt test and the Graham-Kendall test.

Initial attempts to elicit from Dr. Ganter on direct examination his opinion based upon the aforesaid tests as to the "intellectual functioning of Mr. Bees," were met with repeated objections which were at first sustained by the court. Thereafter the court itself interrogated the psychologist with respect to his findings and inquired whether they were entirely factual or a "mixture of facts and opinion." The witness responded that his findings constituted both fact and opinion — that upon the completion of the test, "there does come in the matter of professional judgment and interpretation."

The trial judge thereupon took a recess in order to review the applicable law and subsequently returned to the bench and announced that he was going to reverse his ruling subject to the right of appellant's counsel to cross-examine the psychologist on his qualifications. Counsel declined to do

(1966) which defined the single right of action of husband and wife for injury to the marital relationship in consequence of physical injury to one of the spouses.

so. Thereupon, the members of the jury were returned to the jury box and the court stated: "Members of the jury, my research in the case was that my initial ruling was wrong. I am going to permit the doctor to state not only his factual findings but opinions based on those findings." The psychologist's subsequent testimony may be summarized as follows:

> That on the Wechsler Adult Intelligence Scale the results were in the high average range and the patient was still functioning at a relatively good level. The witness, reading from his report, went on to state, however: "He had to work extremely slowly and painfully, and this kind of psychomotor retardation is obvious throughout the two-hour testing session."
>
> The preceptual testing seen on the Bender-Graham-Kendall test was adequate. Again, however, the patient had to work in a slow tedious fashion and "on the recall there was confusion about the designs." Explaining recall on designs, the witness stated that the patient draws the designs and later does it from memory and that these are graded according to age and intelligence level in general. We consider this, he said, "as one of the two or three major signs of organic brain damage." [2]
>
> The overall impression was that Mr. Bees had above average intellectual potential and was still working at a high average level but with handicaps in terms of memory deficiency, psychomotor retardation and a mild aphasic condition. Aphasia was defined as among other things the difficulty of retaining the names of old familiar objects. On the Eisenson test

---

2. No objection was made to this reference to "brain damage" nor was any motion to strike made. A subsequent effort by Mr. Bees' counsel to elicit further testimony concerning "brain damage," noted in the text of this opinion, *infra*, was objected to and the objection was sustained.

for aphasia, the patient demonstrated a "classic kind of symptom" because he was confused. This confusion was between the number 14 and the number 41 which he had first had difficulty differentiating.

On the Wechsler Memory Scale the psychologist found a borderline retarded "memory quotient," notwithstanding a high average I.Q.

In the personality testing — under a sentence completion test and the Rorschach test — his responses were typical of two classes of people — "mentally retarded people or people with organic brain damage; and again, you know, we dismissed the mental retardation question." [3] It was also noted that on the sentence completion test he printed all of his responses ("which has always been his way of printing") but frequently they were quite unclear.

The psychologist was, however, precluded from expressing an opinion as to the cause of Mr. Bees' problems. This is seen from the following excerpt from his testimony:

"Q (By Mr. Lentz) In your Education and training, are you able both through schooling and in practice or in your field, are you trained to find or have an opinion as to the cause of an individual's problems?

A Yes.

Q And that is part of your training?

A Yes.

Q Doctor, did you in this case have an opinion as to the cause of the problems in Mr. Bees' case?

A Yes, I did.

Q All right; what is that opinion?

---

3. *See* footnote 2, *supra.*

MR. HARRISON: Objection.
THE COURT: Sustained."

And again, after the psychologist stated in a summary of his findings that "there are obvious difficulties in terms of psychomotor retardation and a mild aphasic condition which interferes with his using verbal concepts as readily as he used to and which also interferes at times with basic arithmetic concepts," the witness was again not permitted to testify as to causation:

"Q Doctor, can you tell us from your findings of the tests what you found was the cause of the psychomotor retardation with a mild aphasic condition?
MR. HARRISON: Wait a minute; I object to that again.
THE COURT: Sustained.
Q (By Mr. Lentz) Doctor, during your testing, did you find the cause of those conditions?
A I don't frankly know how to answer that question. I have an opinion.
Q What is your opinion based on?
MR. HARRISON: Objection.
THE COURT: Sustained. Same thing; *you're getting into the medical expertise.*" (Emphasis added.)

With reference to the re-evaluation of the patient on May 25, 1972, the psychologist testified that the same tests were given and that intellectual functioning remained essentially the same "with some improvement in terms of recall of newly-learned material." It was the psychologist's conclusion that Mr. Bees had intellectual functioning impairment "to a mild but significant degree." The court, however, sustained objections as to whether his testing showed any organic brain damage, stating: "You've gone as far as you can get, a lot better than I thought you were going to get when I first started to rule."

On cross examination the psychologist testified that the most significant finding of all the tests was the "memory deficit, memory for new material deficit."

The contention is made on appeal that the psychologist should not have been permitted to testify "as to possible causes of the findings of his tests." We find no impropriety in the trial court's rulings. It is abundantly clear from the record above summarized that the clinical psychologist was stopped far short of expressing an opinion as to the ultimate cause of the patient's intellectual impairment and personality change. There is an important and very fundamental distinction between that ultimate question and the psychologist's judgments and interpretations of the various tests which he administered.

This distinction, we think, was clearly recognized by the trial court and, on the facts, we find no support for the appellant's contention that the court in effect permitted "a non-medical person to relate to a jury the probable physical cause of aphasia or psychological retardation in the absence of any corroboration from medical personnel."

While there is substantial authority for the proposition elsewhere, *Jenkins v. United States*, 307 F. 2d 637 (D.C. Cir. 1962); *United States v. Riggleman*, 411 F. 2d 1190 (4th Cir. 1969), the Maryland cases do not hold that *some* psychologists are qualified to render expert testimony in the field of mental disorders on the ultimate question as to the existence or not of a mental disease or condition and a causal relationship between such disease or condition and some unlawful act. *State v. Tull*, 240 Md. 49, 212 A. 2d 729 (1965); *Saul v. State*, 6 Md. App. 540, 252 A. 2d 282 (1969) affirmed on other grounds, 258 Md. 100, 265 A. 2d 178 (1970); *Millard v. State*, 8 Md. App. 419, 261 A. 2d 227 (1970); *Sherrill v. State*, 14 Md. App. 146, 286 A. 2d 528 (1972).

In *Saul* we found no error in the exclusion at the trial level of the opinion of a clinical psychologist that the appellant was suffering from a mental disease or defect and lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of

law, the test of insanity under Code (1957) Art. 59, § 9(a).[4] There, as here, the psychologist held a Doctor of Philosophy degree in Psychology, had extensive experience in clinical psychology and was a Diplomate of the American Board of Examiners in professional psychology. We there held that an opinion on the ultimate issue, whether or not the accused was insane under the test prescribed by the statute, should be reached by a medical diagnosis and that the opinion, to be admissible, must be that of a medically-trained psychiatrist.

In *Saul,* Chief Judge Orth writing for the Court rejected a contention that *State v. Tull, supra,* compelled a contrary result. He noted that the Court of Appeals in *Tull* in an opinion by Judge (later Chief Judge) Hammond, observed that courts are divided on the question whether a psychologist "is qualified to express an opinion as to mental disease or condition, as opposed to giving factually the results of his tests on and observations of the patient" (240 Md. at p. 55). The opinion also pointed out that in *Tull* the Court of Appeals discussed the education and experience usually required to qualify a psychologist as an expert in order to testify on the results of his tests and observations but did not find it necessary to decide whether a psychologist was qualified to express an opinion as to mental disease or defect or responsibility for criminal conduct. It was our conclusion in *Saul* that "the existence of a 'mental disease or defect' is first and foremost a medical problem."

The holding of this Court in *Saul* is, we think, applicable generally and sets forth the essential criteria governing the admissibility of the testimony of a qualified psychologist in civil cases as well.[5] Maryland has not adopted the more **liberal rule followed by the Courts of Appeals for the Fourth Circuit and the District of Columbia Circuit, that a**

---

4. Art. 59 was repealed in its entirety in 1970 and a new Art. 59 enacted in its place. The test for criminal responsibility was modified and became § 25 (a) of the new Act.

5. *See,* Annotation: "Qualification of nonmedical psychologist to testify as to mental condition or competency," 78 A.L.R.2d 919, and n. 2 which states: "It has been said that the majority of the reported cases relating to the psychologist as an expert witness are in the field of criminal law, but are worthy of study by the tort lawyer who is seeking authority for use of the psychologist in his case. *See,* 39 Marquette L. Rev. at p. 242."

psychologist is not barred as a matter of law from giving expert testimony as to the presence or absence of mental disease or defect. *Jenkins* and *Riggleman, infra.*

As *Saul* made abundantly clear, however, the qualified psychologist plays a supporting role of immense significance:

> "Without question tests by and observations of qualified psychologists are invaluable to the psychiatrist in reaching his opinion as to whether as a result of mental disease or defect an accused is insane and the testimony of such psychologists as to the results of the tests made by him are properly admissible as a means of enlightening the trier of fact, to be considered by it as one of the means by which the psychiatrist reached his opinion as to the sanity or insanity of the accused."

In this connection, the trial judge here correctly relied upon the decision of the United States Court of Appeals for the Fourth Circuit in a civil action wherein error was found in exclusion of the testimony of a qualified psychologist. *Hidden v. Mutual Life Insurance Company of New York*, 217 F. 2d 818 (1954). There, a suit was brought upon the total and permanent disability clauses of two life insurance policies based upon an alleged disabling nervous condition. Testimony was received on behalf of the claimant of two experts in the field of psychiatry and neurology. Another expert was not a physician but a doctor of philosophy in clinical psychology. His qualifications were impressive and unchallenged. One of the psychiatrists for the insured testified that in forming his opinion he depended in part upon the objective tests made by the clinical psychologist. The trial court, Chestnut, J., excluded the testimony of the psychologist who had examined the insured and had subjected him to some of the same tests administered in this case by Dr. Ganter. The psychologist testified that he was able to express an opinion as to the condition of the insured not only at the time of the examination but also several years earlier before the insured became 60 years of age. On-

appeal it was noted that the basis for the exclusion was that the witness was not qualified as an expert and that an offer to show that in his opinion the insured was totally and permanently disabled and was in this condition in 1949, was rejected. This determination was reversed in an opinion by Judge Soper stated in part:

> "The uncontradicted evidence received at the trial tended to show that the expert was qualified in his field by academic training and by experience; *and also that the objective tests which he described, although perhaps not well known to the general public, were recognized as helpful by medical experts in psychiatry.* Moreover, one of the psychiatrists, whose testimony was received, based his opinion as to the condition of the insured in part upon the objective tests given by the psychologist to the insured in this case. Accordingly it is our view that the evidence should have been received, and we are unable to say that its exclusion was harmless since the expert testimony played so large a part in the trial of the case." (217 F. 2d at 821). *See also: Crews v. Director,* 245 Md. 174, 225 A. 2d 436 (1967); *Mills v. State,* 12 Md. App. 449, 279 A. 2d 473 (1971); *Harding v. State,* 5 Md. App. 230, 246 A. 2d 302 (1968).

We perceive no affront to Maryland law in the rulings of the trial judge with reference to the admissibility of Dr. Ganter's testimony.

## II

With respect to appellant's rather vehement protestations that there was no evidence of organic brain damage presented and the jury should not have been permitted to consider it, we note at the outset that appellant made no objection to the court's jury instructions nor does the record disclose any request on the part of the appellant for an instruction with respect to organic brain damage which was

denied. Our perusal of the carefully worded instructions of the trial court discloses that the court itself made no reference to organic brain damage. Nor were there, as previously noted, any objections to the psychologist's testimony other than those above noted, after the trial court reversed itself. Assuming, however, notwithstanding the provisions of Maryland Rule 1085, that the question has been preserved for appeal, we find that the testimony of the psychiatrist, Dr. Kemp, is in direct contradiction of appellant's position. While it is true that the psychiatrist stated that she did not have an opinion as to the cause of appellee's psychomotor retardation, the following testimony of the psychiatrist on direct examination, given without objection, unequivocally relates to both the fact of brain damage and its causation.

"Mr. Lentz:

Q  Doctor, what is your *impression?*

A  My impression is that we're dealing with a *chronic brain-damaged* individual.

Q  What do you mean by chronic brain damage?

A  I mean that the patient has sustained some injury to the brain that is interfering with his ability to think.

Q  Doctor, based on *reasonable medical certainty, do you have an opinion as to the cause of the chronic brain-damage?*

A  The only cause that I know of would be the brain injury, or I shouldn't say brain injury; *I should say the head injury sustained in this automobile accident, followed by a period of unconsciousness which is indicative of some degree of trauma having occurred to the brain.*

* * *

Mr. Lentz:

Q  Would it be surprising, would it surprise you, Doctor, or make any difference in your opinion to find that a neurologist in February of 1969 found

no neurological signs, nor did the family doctor clear up until 1972, I believe it was, find any neurological objective findings?

A No, no, that wouldn't surprise me at all.

Q That wouldn't change your opinion in any way?

A No.

Q Doctor, you say that you attributed this condition to his accident. Now what accident are you talking about; the accident of February 4, 1969?

A Yes.

Q Doctor, do you, with a reasonable degree of medical certainty, have an opinion as to whether or not the condition that Mr. Bees has is permanent?

A *It's my medical opinion that at this point in time from '69 to '73 is four years, and we're approaching five years, and it would be my opinion that he has probably reached the highest level of functioning return that he is going to reach.*

Q Do you have an opinion based on reasonable medical certainty as to whether or not his condition is permanent?

A Yes.

Q What is that opinion?

A I feel it's permanent." (Emphasis added.)

We also reject appellant's contention that the psychiatrist's testimony with respect to organic brain damage was "based on hearsay statements in the reports of the clinical psychologist" and should not have been received. The psychiatrist herself examined the appellant in the absence of Dr. Rafky with whom she was associated. (As a treating physician, an objection to her relating the patient's history was properly overruled.) In her clinical examination she found that he was "not functioning normally as far as language reception was concerned;" and found him

extremely preoccupied during the entire interview with memory difficulties. In describing what her examination consisted of Dr. Kemp replied:

"A  Well, first of all you take into consideration his general appearance, his activities during — I should say his actions rather during the interview; his responses to questioning; his responses to you as a person, his speech, his manner of speech, his manner of understanding, his manner of cooperation, his thought contents; that is to say whether he has any abnormal thoughts or whether they are what we would consider normal. You take into consideration the ability to calculate simply, such as what we call serial sevens where you have the patient take a hundred, and then you subtract seven, and then take seven from that and keep on going and going; his ability to repeat digits forwards and digits backwards."

Dr. Kemp further testified that Mr. Bees, on the basis of responses detailed by her in her testimony to questions put to him showed "interference with cerebral functioning." Thereafter she related her findings with respect to brain damage set forth above. With respect to the psychological tests given by Dr. Ganter, her testimony was as follows:

"Q  All right, Doctor; do you have any other tests or testings that you took?

A  I did not do any testings. I understood that he had two testings by Dr. Ganter.

Q  Did you review those psychological tests.

A  Just in retrospect. My impression was based purely on clinical impression."

In this state of the record we think that the suggestion is somewhat disingenuous that the psychiatrist based her expert opinion solely upon the tests given by Dr. Ganter. To the extent that the psychiatrist did take cognizance of the psychologist's tests, the propriety of doing so is unexceptionable. *Saul* and *Hidden, supra.*

We note, finally, that the jury also had before it the testimony on behalf of the appellant of Dr. Howard Moses, a neurologist, who testified he saw no "objective evidence of organic neurological disease or brain damage" and of the electroencephalographer, Dr. Curtis Marshall, that he was "unable to see any electrical evidence of brain injury or of a post-concussive state" because the electroencephalogram of Mr. Bees was normal — but also that he could not rule out the possibility that some brain damage occurred. "You can have psychomotor retardation," he testified, "and a completely normal electroencephalograph, and you can have a grossly abnormal electroencephalograph without psychomotor retardation."

There was proper testimony for and against the appellee on the issue of brain damage *vel non*, as well as its nature and extent and causation. A jury question was plainly presented and we find no basis for reversal.

> *Judgment affirmed; appellant to pay the costs.*